COMMISSIONER OF THE DEPARTMENT OF COMMUNITY
AFFAIRS *vs.* BOSTON REDEVELOPMENT AUTHORITY
& others.

Suffolk.   October 3, 1972. — November 15, 1972.

Present: REARDON, QUIRICO, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Redevelopment of Land.   Statute,* Construction.   *Regulation.    State*
*Administrative Procedure Act.*

Under § 26KK of G. L. c. 121, §§ 26I–26NN, the "Housing Authority
Law," revisions in 1971 by the Boston Redevelopment Authority in
its 1957 plan for urban renewal of a substandard area, revisions
which did not constitute a "substantial change" in the plan, did not
require the approval of either the Boston city council or of the
Department of Community Affairs, the latter of which had approved
the plan in 1957 as required by § 26KK; St. 1969, c. 751, recodify-
ing the housing authority law into G. L. c. 121B, and adding
approval by the Boston city council as a requirement, provided that
projects approved as required under prior law were valid without
any further proceedings or approvals [610–615]; the silence on the
matter of approvals of revisions in c. 121, § 26KK [621]; and in the
plan itself indicated that none were required [613–614]; and the con-
duct of the department over fifteen years demonstrated that it did
not think its approval of minor revisions was required, notwith-
standing a contrary 1967 memorandum by its deputy commissioner
which was without validity as an effective regulation [616–618].

BILL IN EQUITY filed in the Supreme Judicial Court for
the county of Suffolk on August 8, 1972.

362 Mass. 602                                                   603

Commr. of the Dept. of Community Affairs *v.* Boston Redevel. Authy.

The suit was reserved and reported by *Reardon,* J.

*Danielle E. deBenedictis,* Deputy Assistant Attorney General, for the Commissioner of the Department of Community Affairs (*John F. Bok,* for West End Community Housing Corporation & others, amici curiae, with her).

*James L. Terry* (*Jeffrey Swope* with him) for Charles River Park, Inc. & others.

*Robert Green* for Boston Redevelopment Authority.

REARDON, J.   This is a bill for declaratory and injunctive relief brought by the Commissioner of the Department of Community Affairs (DCA) against the Boston Redevelopment Authority (BRA) created under statute. Charles River Park, Inc. (CRP), a Massachusetts corporation, was also originally a defendant, and on motion was replaced by Charles River Park "D" and "E" companies, the general partners of which are likewise defendants.   Other parties have been given leave to file briefs as friends of the court.   The case is here on the reservation and report of the single justice.   The matter has been taken on a statement of agreed facts, and there are voluminous exhibits.

A declaration is sought that the BRA must submit revisions of a plan for an urban redevelopment project for the West End of Boston created in 1957 and presently in the process of completion, first to the Boston city council, and then to the DCA, for their respective approvals. The issue before us is thus whether the DCA and the Boston city council have the power to approve or disapprove changes, substantial or otherwise, made in 1971 by the BRA relative to the redevelopment project.[1]

These are the facts.   The BRA is an urban renewal agency as defined in G. L. c. 121B, § 9, and a planning board as well, established under St. 1960, c. 652, § 12. (See G. L. c. 41, § 70.)

---

[1] We are dealing here with a redevelopment project for a substandard area and not with a low income housing project.

In May, 1956, a land assembly and redevelopment plan of the West End of the city of Boston (city) was prepared by the Boston Housing Authority (BHA), the predecessor of the BRA. CRP was designated in November, 1956, by the BHA as redeveloper of the West End project. The plan prepared by the BHA (the 1957 plan) was revised in March and May of 1957. The 1957 plan was the subject of a public hearing of the BHA in April, 1957. The BHA on May 2, 1957, approved the 1957 plan and authorized the project.

On May 27, 1957, following public bidding, a sales contract was executed between the BHA and CRP as the developer, contingent upon approval of the Federal Housing and Home Finance Agency (the agency succeeded by the Department of Housing and Urban Development [HUD]). In July, 1957, after public hearings, the city council approved the 1957 plan and made findings required by Federal law. On July 26, 1957, the mayor approved the council action. Thereafter, on August 19, 1957, the city council approved orders introduced by the mayor authorizing the city to execute a cooperation agreement with the BHA and to issue city bonds for the West End project. After a public hearing held on October 7, 1957, the State Housing Board (which with its successors is hereinafter called the DCA) approved the redevelopment project and made findings required by G. L. c. 121, § 26KK.

On December 20, 1957, the BRA, organized in the prior October under G. L. c. 121, § 26QQ, assumed all the obligations of the BHA toward HUD, the city, CRP, and others with respect to the West End project under a novation agreement approved by all parties in interest. On January 29, 1958, a loan and grant contract between the BRA and HUD was executed and later approved by the mayor and the DCA under statutory authority.[2]  A

---

[2] G. L. c. 121, § 26Y, as appearing in St. 1946, c. 574, § 1. *"Contracts with the Federal Government.* — A housing authority, in each instance with the written approval of the board, and of the mayor of the city . . . in which the project is situated, may enter into agreements with the federal government relative to the acceptance or borrowing of funds for any low-rent housing project, or containing such other

362 Mass. 602                                              605

Commr. of the Dept. of Community Affairs v. Boston Redevel. Authy.

number of amendatory contracts executed between March 12, 1958, and June 24, 1970, were subsequently similarly approved.

On April 9, 1958, the BRA ordered the taking of land in the West End by eminent domain. There were certain subsequent conveyances by the BRA including transfers to the Retina Foundation, the Shriners Hospital for Crippled Children, and the Massachusetts General Hospital. A revised plan (the 1959 plan), providing certain modifications to the 1957 plan, with particular reference to one parcel involved, was adopted by the BRA on October 14, 1959. Preference was afforded to relocatees in the selection of new tenants under both the 1957 and the 1959 plans. HUD concurred in the 1959 plan. The BRA on September 16, 1959, concluded that no approvals of the 1959 plan were necessary other than what had been procured, a conclusion concurred in by letter from the corporation counsel of the city and the general counsel of the BRA. Both the 1957 and the 1959 plans provided for revisions with no reference to approval by the DCA although approvals by HUD and the BRA were explicitly required. On October 26, 1959, the 1959 plan and a proposed leasehold agreement were submitted to the city council. Hearings were held by its committee on urban renewal, and that plan and the agreement were subsequently placed on file by the council with no further action. Revisions of the 1959 plan were authorized by the BRA on nine occasions from October of 1959 until

---

covenants, terms and conditions as the housing authority, with like approval, may deem desirable. The mayor of the city, with the approval of the city council, . . . [is] hereby designated as the governing body of the city . . . for such approval of a project as may be required by federal legislation. A housing authority, with like approval, may enter into a contract with the federal government for purchasing or leasing a clearance or housing project owned or controlled by the federal government. . . ."

G. L. c. 121, § 26MM, inserted by St. 1946, c. 574, § 1. "*Sections Applicable to Land Assembly and Redevelopment Projects.* — The provisions of the following section of this chapter shall, so far as apt, be applicable to land assembly and redevelopment projects under this chapter, and to housing authorities while engaged in such projects; section twenty-six Y . . . ."

The above statutes were repealed by St. 1969, c. 751, § 2.

October of 1965. These changes included modification of certain parcel boundaries, transfer of parcels out of the project, and redesignation of permitted uses. On November 5, 1959, the board of zoning adjustment of the city, after public hearing, granted the zoning changes generally contemplated by the 1959 plan. On February 24, 1960, the BRA authorized a leasehold agreement between CRP and itself (the master leasehold agreement) which was dated November 23, 1959, but was executed on March 2, 1960. Through the years 1959 and 1960 the master leasehold agreement and the closing on the first parcel in the project received "widespread publicity."

In the period from 1962 through 1971 the city council passed repeated resolutions authorizing applications for State aid to the project. The BRA's applications for State aid from April 13, 1962, through 1971 received repeated annual approvals from the DCA as required under G. L. c. 121, § 26FFF.

It was originally contemplated that a school be built on parcel 2 as then designated on a map of the area. In 1962, a professional report on school needs did not recommend that a new public elementary school be built on parcel 2 of the project or that the Blackstone School be reopened for public purposes, which was originally contemplated.

The deputy commissioner of the DCA, in a memorandum dated April 27, 1967, which was sent to all redevelopment authorities, stated in part: "Prior to any plan change notification of such change must be submitted to the division for review and written approval." No public hearing was held on this memorandum nor was a copy thereof filed with the Secretary of the Commonwealth.

On June 11, 1968, the public facilities commission of the city of Boston passed a vote that the BRA be advised that it claimed no hold on parcel 2 of the West End project and that it did not oppose any BRA determination "to proceed with redevelopment plans of the Authority's choice." Preliminary plans approved in a vote of

the BRA on June 20, 1968, included a proposed office building on parcel 1F of the project plan.

On February 11, 1971, HUD declared the development on parcels 1E and 1F of two 35 story apartment buildings, a 10 story office building, 1,200 enclosed parking spaces, tennis courts, a swimming pool, and a skating rink to be feasible. On February 25, 1971, the BRA approved by vote the plans of CRP, including an office building and housing for the elderly, and also voted to deliver parcels 2–1E and 1F with the exception of area E to CRP, and to amend the master leasehold agreement in accordance therewith. On April 26, 1971, in response to a request for a status report on all pre-1968 State aided or Federal Title I renewal projects, the director of the BRA wrote the deputy commissioner of the DCA a letter reporting on the West End project. On August 27, 1971, HUD, which had been alerted to the amendment of the master leasehold agreement between the BRA and CRP, wrote the BRA stating concurrence by it was not required.[3]

On September 9, 1971, certain plan changes relating to parcels 2–1E–1F were confirmed and announced by the BRA (hereinafter termed the 1971 plan changes). These plan changes deleted the designation "public" use from the description of parcel 2, deleted the designation "Multi-Family Residential" use from parcels 1E and 1F, and added the designation "Parcel 2–1E–1F — multi-

---

[3] "Our June 3rd letter to you indicated that in order for us to concur in this amendment, the Authority would be required to make changes in the existing Land Assembly and Redevelopment Plan (Urban Renewal Plan) appropriate to the development of the proposed office tower. We indicated to you at that time that because they involved a substantial increase in the intensity of development of a primary land use in the project as a whole, such changes would require our concurrence. Our review of your letter of June 28 indicates that in fact this concurrence is not required.

"We draw this conclusion from the fact that the total commercial space to be developed in the project area as a whole under the modified plan is well within the total permitted in the existing plan. This is true because the development on the current commercial sites is significantly less than that permitted by the existing plan. The additional space now proposed does not, therefore, constitute an increase in the intensity of commercial use allowed by the Redevelopment Plan approved by Boston Redevelopment Authority and the City Council."

family residential with complementary and accessory commercial uses," and changed the density designation for the parcel. The BRA, consistent with its practice since 1957, did not seek approval of the 1971 plan changes from the city council or the DCA. This was followed by leases of two areas in parcel 2–1E–1F to Charles River Park "D" and "E" companies. Thereafter both of these companies applied to the FHA for financing on their respective parcels. The plans approved by the BRA for the area and included in the FHA applications involve a 10 story office building containing 214,251 square feet, retail stores containing 11,241 square feet, an underground parking garage and a separate parking structure providing, in total, space for 1,200 cars, two 35 to 37 story apartment buildings containing 710 apartments with 855,776 square feet, including two partial floors of professional office space containing 22,710 gross square feet, a 1,000 square foot kiosk adjacent to the skating rink and swimming pool, and a 10 story housing for the elderly structure containing 101,515 square feet with 152 apartments.

Thereafter, the BRA and the city zoning commission held public hearings on the plans affecting the two areas and approved the planned development area for each. Subsequently, on April 4, 1972, after a public hearing held earlier, the board of appeal granted exceptions to the Boston zoning code for the same two areas, no appeal being taken from that decision. On April 18, 1972, HUD issued a commitment to Charles River Park "D" Company for mortgage insurance covering the buildings to be built by it. Charles River Park "D" Company commenced excavation on April 18, 1972, at the construction site, and on that date paid the balance due on its commitment and application fees to the FHA.

On April 20, 1972, the acting commissioner of the DCA sent the director of the BRA a letter alleging that its intention to proceed with the development of the West End urban development plan was illegal in that (1) the DCA had not concurred in the 1971 plan changes, (2) the

362 Mass. 602                                                              609

Commr. of the Dept. of Community Affairs *v.* Boston Redevel. Authy.

fiscal viability of the plan was doubtful in the light of the uncertainty of the HUD commitment, and (3) the lack of provisions for low and moderate income housing contravened the "oft stated" policy of the department. By letter on April 25, 1972, the director of the BRA responded that prior to December 30, 1971, there were "no regulations regarding the requirement of the Department of Community Affairs' approval of minor Plan changes." He emphasized that HUD had made a commitment in the amount of $42,677,400, making the project fiscally viable, and reminded the DCA that the parcel was committed to the developer under an agreement approved by Federal authority which failed to mention any specific type of housing and required only multi-family residential housing. He further pointed out that in fact the BRA had required the developer to include 150 units of low to moderate income housing for the elderly. In answer to the BRA letter, on May 2, 1972, the acting commissioner of the DCA called for a copy of the master leasehold agreement and a conference, and referred to the 1967 memorandum of the deputy commissioner previously alluded to. In reply the director of the BRA stated his unwillingness to concur in the DCA contention that the BRA was forced to submit minor changes for the DCA's approval.

On July 12, 1972, HUD granted permission to the developer to proceed with the construction of the foundations of towers one and two. On July 18, 1972, the DCA commissioner wrote the director of the BRA calling for an approval of the changes in the plan by the mayor and the city council prior to action by the DCA, stating that the changes were substantial and that such approvals were thereby rendered necessary. On July 19, 1972, HUD withdrew its approval to construct the foundations referred to in the letter of July 12, but reinstated this permission on July 27 on the basis that the problem involved an issue of State law to be decided "in an appropriate forum."

The pertinent statutes require that the DCA approve

urban renewal plans like the West End plan.  Neither the statutes nor the plan itself, however, contain any express requirement of the DCA approval of any changes in such a plan, although both the statutes and the plan contemplate the possibility of future revisions.  The plaintiff argues that the DCA has the implied power to require submission of revisions for a determination of their substantiality, and to approve or disapprove those changes which are found to be substantial.  It further argues that since the DCA has determined that the 1971 revisions constitute a substantial change in the plan, and since those revisions have not been approved by the DCA, the BRA must be ordered to submit the revisions for approval, first to the city council and then to the DCA, and, further, that CRP must be enjoined from proceeding with further construction pending the city council and DCA approval.  Careful consideration of the total circumstances of this case persuades us that these contentions are not valid.

1. The West End area land assembly and redevelopment plan was unconditionally approved by the DCA on October 17, 1957, after public hearing, in accordance with the statutory requirement of G. L. c. 121, § 26KK, as amended through St. 1953, c. 647, § 18.[4]

---

[4] "Whenever a housing authority determines that a project for the assembly and redevelopment of a sub-standard, decadent or blighted open area ought to be undertaken in the city . . . in which it was organized, it shall apply to the housing board for approval of such a project.  Such application shall be accompanied by a plan for the project, and a statement of the method proposed for financing the project and such other information as the board may require.  The board shall hold a public hearing upon such project, if requested in writing to do so, within ten days after the submission of the project, by the housing authority, or by the mayor or city council of the city . . . in which the proposed project is located, or by twenty-five or more taxable inhabitants of such city . . ..

"The housing board shall not approve any land assembly and redevelopment project unless the planning board, established under the provisions of section seventy or section eighty-one A of chapter forty-one for the city . . . where the project is located, shall have found and the housing board shall have concurred in such finding, or, if no planning board exists in such city . . ., unless the division of planning in the department of commerce shall have found and the housing board shall have concurred in such finding that the redevelopment plan is based upon a local survey and conforms to a comprehensive plan

362 Mass. 602                                      611

Commr. of the Dept. of Community Affairs *v.* Boston Redevel. Authy.

As a preliminary matter we find that the question whether any further approvals are required is to be determined on the basis of G. L. c. 121, § 26KK, and not, as the plaintiff suggests, on the basis of G. L. c. 121B, § 48. Prior to November 19, 1969, the subject of land

for the locality as a whole. The housing board shall likewise not approve any land assembly or redevelopment plan unless it shall have found (a) the project area would not by private enterprise alone, and without the aid sought by the housing authority from the federal government or other subsidy, be made available for development or redevelopment, (b) the proposed land uses and building requirements in the project areas in the locality where the project area is located will afford maximum opportunity to privately financed development or redevelopment consistent with the sound needs of the locality as a whole, (c) the financial plan is sound, and (d) the project area is a sub-standard, decadent or blighted open area. The housing board shall, within thirty days after submission of the application, give written notice to the authority of its decision with respect to such project.

"If the housing board shall disapprove any such project, it shall state in writing in such notice its reasons for disapproval. Unless and until written approval of such project is obtained, the housing authority shall not undertake such project; provided, however, that when a housing authority has determined the location of a proposed land assembly and redevelopment project, it may, without awaiting the approval of the housing board, proceed, by option or otherwise, to obtain control of the real property within the location; but it shall not, without the approval of the board, unconditionally obligate itself to purchase any such property. A project which has not been approved by the housing board when submitted to it may be again submitted to it with such modifications as are necessary to meet its objections."

The above statute was repealed by St. 1969, c. 751, § 2.

Statute 1969, c. 751, recodified G. L. c. 121, as hereinafter indicated in the text.

"SECTION 5. Nothing in this act shall affect the powers, rights, duties or obligations of the commonwealth or of any board, division, department, authority or other political subdivision of the commonwealth under the provisions of sections twenty-six I to twenty-six MMM, inclusive, . . . of the General Laws or the validity of any action taken thereunder, on or before the effective date of this act. Without limiting the generality of the foregoing, any project, contract or transaction initiated or entered into by the commonwealth or any board, division, department, authority or other political subdivision thereof which was approved by the persons whose approval was required under the provisions of said sections prior to the effective date of this act shall be valid and may be carried out in accordance with its terms without any further proceedings or approvals under this act. Any project, contract or transaction initiated or entered into by the commonwealth or any board, subdivision, department, authority or other political subdivision thereof which has not been fully approved under the provisions of said sections prior to said effective date need not be reinitiated, but shall require only such further approval or proceedings as are provided under this act in substitution for the approval or proceedings provided under said sections but not obtained or taken prior to the effective date of this act.

"A housing authority or redevelopment authority created in any city . . . under the provisions of sections twenty-six K or twenty-six

612                                        362 Mass. 602

Commr. of the Dept. of Community Affairs *v.* Boston Redevel. Authy.

assembly and redevelopment was covered by G. L. c. 121, §§ 26I–26NN, the "Housing Authority Law," inserted by St. 1946, c. 574, § 1. The Housing Authority Law was recodified into G. L. c. 121B by St. 1969, c. 751, § 1. Section 48 of c. 121B, which essentially replaces c. 121, § 26KK, for purposes of describing the approval pro-

---

QQ of chapter one hundred and twenty-one of the General Laws and existing on the effective date of this act shall be deemed to be, and shall have all the powers, rights, duties and obligations of, the housing authority or redevelopment authority created in such city . . . under the provisions of sections three or four, as the case may be, of chapter one hundred and twenty-one B of the General Laws, as inserted by section one of this act . . . ."

G. L. c. 121B, § 48, inserted by St. 1969, c. 751, § 1:

"No urban renewal project shall be undertaken until (1) a public hearing relating to the urban renewal plan for such project has been held after due notice before the city council of a city . . . and (2) the urban renewal plan therefor has been approved by the municipal officers and the department [the DCA] as provided in this section.

"Whenever the urban renewal agency determines that an urban renewal project should be undertaken in the city . . . in which it was organized, it shall apply to the municipal officers for approval of the urban renewal plan for such project. Such application shall be accompanied by an urban renewal plan for the project, a statement of the proposed method for financing the project and such other information as the urban renewal agency deems advisable.

"Every urban renewal plan approved by the municipal officers shall be submitted to the department together with such other material as the department may require.

"The department shall not approve any urban renewal plan unless the planning board established under the provisions of section seventy or eighty-one A of chapter forty-one for the city . . . where the project is located has found and the department concurs in such finding or, if no planning board exists in such city . . . , the department finds that the urban renewal plan is based upon a local survey and conforms to a comprehensive plan for the locality as a whole. The department shall likewise not approve any urban renewal plan unless it shall have found (a) the project area would not by private enterprise alone and without either government subsidy or the exercise of governmental powers be made available for urban renewal; (b) the proposed land uses and building requirements in the project area will afford maximum opportunity to privately financed urban renewal consistent with the sound needs of the locality as a whole; (c) the financial plan is sound; (d) the project area is a decadent, substandard or blighted open area; (e) that the urban renewal plan is sufficiently complete, as required by section one; and (f) the relocation plan has been approved under chapter seventy-nine A.

"Within sixty days after submission of the urban renewal plan, the department shall give written notice to the urban renewal agency of its decision with respect to the plan. If the department shall disapprove any such plan, it shall state in writing in such notice its reasons for disapproval. A plan which has not been approved by the department when submitted may be again submitted to it with such modifications, supporting data or arguments as are necessary to meet its objections. The department may hold a public hearing upon any urban

362 Mass. 602                                          613

Commr. of the Dept. of Community Affairs *v.* Boston Redevel. Authy.

cedures for renewal projects, differs in part from c. 121, § 26KK, in that it contains an additional requirement of approval by the city council. However, St. 1969, c. 751, § 5, provided that projects and contracts approved as required under prior law were valid and could be carried out under the recodification without further proceedings or approvals, and that projects and contracts in the process of being approved need only have such further approvals as were provided by the recodification *in substitution* for the approvals not yet obtained. Since, therefore, city council approval was not required for the West End plan, we need not consider the power of the city council to rule on subsequent changes in the plan, and we deal only with the role of the DCA. We have in the statement of facts in this case made reference to the knowledge and activity of the city council solely to indicate that the progress of the West End redevelopment has at all times been thoroughly known to the council.

A survey of the relevant statutes, the provisions of the West End plan itself, and the circumstances of its implementation indicate that primary responsibility for representing the public interest in the project and for supervising the execution of the plan was vested in the BRA, and that the role of the DCA was limited to initial approval of the plan in its broad outlines.[5]

General Laws c. 121, § 26J, defined a land assembly and redevelopment plan as "a detailed plan, as it may exist from time to time," and clearly contemplated the possibility of revisions. Yet § 26KK, which required the DCA approval of the original plan, did not require approval of revisions. That this silence in the statute was intentional is suggested by the fact that analogous statutes which provided for the DCA approval of other

---

renewal plan submitted to it, and shall do so if requested in writing within ten days after submission of the plan by the urban renewal agency, the mayor or city council of the city . . . in which the proposed project is located, or twenty-five or more taxable inhabitants of such city . . . ."

[5] See G. L. c. 121, § 26KK; G. L. c. 121B, § 48; and St. 1969, c. 751, § 5.

plans went further and expressly required approval of "fundamental" or "substantial" revisions. See G. L. c. 121A, §§ 6 and 13, dealing with urban redevelopment corporations, and G. L. c. 79A, §§ 5 and 8, dealing with relocation plans.

Furthermore, the West End plan itself, as approved by the DCA in 1957, did not require the DCA approval of any changes. The provision for "Amendments to the Redevelopment Plan" states in its entirety: "Subject to applicable Federal, State and local laws, this plan may be amended by the Boston Housing Authority, subject to the approval of the Housing and Home Finance Agency and further provided that if modified after lease or sale of any land in the Project Area the amendment must be consented to by the lessee or purchaser of the property affected by the proposed amendment."

The plaintiff argues that the initial clause of this provision imports the implied requirement of the DCA approval of changes under G. L. c. 121, § 26KK. Given the silence of G. L. c. 121, § 26KK, on the matter of the DCA approval of changes in the plan, coupled with the fact that the amendment provision in the plan explicitly requires action by one agency and approval by another, such a reading of the provision is not permissible. The clause "subject to applicable . . . State . . . laws" clearly refers to requirements imposed by State law on the subject matter and contents of plans themselves. Moreover, the fact that other redevelopment plans for urban renewal projects in Boston have included provisions requiring the DCA approval of substantial amendments to such plans indicates that if that requirement had been intended here it would have been expressed.

Thus, the DCA was aware when it approved the plan that it did not reserve any power to control subsequent changes under G. L. c. 121, § 26KK. Had the DCA been concerned about the nature of changes in the plan, it could have made its original approval conditional upon

submission to it for approval of later changes.[6]  As it was, however, the DCA acquiesced in a project which did not provide for subsequent supervision by it.

The failure of the plan to provide for the DCA approval of all changes, or even of substantial changes, can be construed as deliberate.  In view of the nature of this urban renewal plan and the overall statutory structure, it is entirely reasonable that the DCA's role should be limited to initial approval.  This does not run contrary to the public interest.  Fifteen years of history have served amply to demonstrate that the West End project is not only substantial but is highly complex.  Through such a period, change in the economy, change in construction costs, and change in what might constitute the best use of the area demanded constant flexibility in settling on plan designs.  Were each plan revision required to be submitted for the DCA approval on a day to day, or even month to month, basis, a hopeless administrative morass would develop.  Such a dilemma could only thwart the main objective.  This could not be deemed a legislative aim nor would it satisfy the requirements of common sense.

On the other hand, these practical considerations do not mean that the plan is left entirely to the whim of the developers.  They merely indicate that as a matter of legislative judgment the local agency, in this instance the BRA rather than the State agency, has been granted the basic responsibility for the proper execution of the plan.

It does not follow that a plan once approved by the DCA can be made subject to change without any restraints whatever.  The possibility of collusion between a redeveloper and a local agency which leads to torturing a plan out of any semblance to that initially approved is small indeed.  Ulterior and improper motives which lead

---

[6] Redevelopment plans for urban renewal projects in Boston approved since approval of the 1957 plan and the 1959 plan, in one form of words or another, have provided for the city council and the DCA approval of substantial amendments.

to a plan change can be adequately dealt with in the courts. See *Despatchers' Cafe Inc.* v. *Somerville Housing Authy.* 332 Mass. 259, 263.

2. The DCA's course of conduct in relation to the West End project over the past fifteen years demonstrates that not even the DCA itself thought that c. 121, § 26KK, required the submission to it of all changes for a determination as to substantiality and approval of substantial changes. As we have pointed out above, the West End project has, from soon after the time of its original approval to the present, been subject to a long series of changes including parcel transfers and acquisitions, redesignation of parcel boundaries and uses, and density alterations. There is no intimation that these changes were made surreptitiously, nor even that the DCA was unaware of them. Yet the DCA asserted no right through the years to review them, and acquiesced in the BRA's determination that such changes as were made were minor and did not require the DCA approval.

The plaintiff's sole evidence of a "long-established" administrative practice requiring submission of changes to the DCA is its 1967 memorandum. However, this three sentence memorandum from the deputy commissioner of the DCA to all redevelopment authorities on April 27, 1967, can hardly be characterized as indicating long established and consistent administrative practice under the statute in question. The memorandum reads: "The Division of Urban Renewal shall be notified by the Local Public Agency prior to any increase in the budget of all Title I Projects as previously approved by the Division of Urban Renewal. The Local Public Agency must have written approval of the increase in the budget from the Division of Urban Renewal; otherwise the division will not consider participating in the additional cost. Prior to any plan change notification of such change must be submitted to the division for review and written approval." The first two sentences suggest that "plan change" refers only to changes involving budget increases, and that in any event the only sanction for not

362 Mass. 602                                        617

Commr. of the Dept. of Community Affairs *v.* Boston Redevel. Authy.

receiving the DCA approval is that the DCA will not participate in the amount of the unapproved cost increase. The record does not indicate that the DCA has been requested to participate in any such increase. There is nothing in the memorandum suggesting that the DCA believed that construction in accordance with changes could not proceed without the DCA approval. Moreover, the memorandum has no validity as an effective regulation. General Laws c. 30A, § 3, inserted by St. 1954, c. 681, § 1,[7] required that, in general, prior to the adoption of a regulation an agency should give notice and afford interested persons an opportunity to present data, views or arguments. Further, G. L. c. 30, § 37,

---

[7] "Prior to the adoption or amendment of any regulation other than those subject to section two, or the repeal of any regulation, an agency shall give notice and afford interested persons an opportunity to present data, views or arguments, as follows: —

"(1) The agency shall, within the time specified by any law, or if no time is specified, then at least twenty-one days prior to its proposed action, (a) publish notice of its proposed action in such manner as is specified by any law, or if no manner is specified then in such newspapers, and, where appropriate, in such trade, industry or professional publications as the agency may select; and (b) notify any person specified by any law, and, in addition, any person or group filing written request, such request to be renewed yearly in December, for notice of proposed action which may affect that person or group, notification being by mail or otherwise to the last address specified by the person or group.

"The notice shall (a) refer to the statutory authority under which the action is proposed; (b) give the time and place of any public hearing, or state the manner in which data, views or arguments may be submitted to the agency by any interested person; (c) either state the express terms or describe the substance of the proposed action, or state the subjects and issues involved; and (d) include any additional matter required by any law.

"(2) The agency shall afford interested persons an opportunity to present data, views or arguments in regard to the proposed action orally or in writing. If the agency finds that oral presentation is unnecessary or impracticable, it may require that presentation be made in writing.

"(3) If the agency finds that the requirements of notice and opportunity to present views on its proposed action are unnecessary, impracticable or contrary to the public interest, the agency may dispense with such requirements or any part thereof. The agency's finding and a brief statement of the reasons for its finding shall be incorporated in the regulation, amendment or repeal as filed with the state secretary under section thirty-seven of chapter thirty.

"This section does not relieve any agency from compliance with any law requiring that its regulations be approved by designated persons or bodies before they may become effective."

as amended through St. 1951, c. 556, § 1,[8] required that regulations be filed with the Secretary of the Commonwealth, and provided that such regulations should not take effect until so filed. It is admitted that the DCA did not hold public hearings and did not file the letter with the Secretary. Therefore, the deputy commissioner's letter has no force and effect on the BRA. See *Massachusetts Gen. Hosp.* v. *Commissioner of Pub. Welfare,* 346 Mass. 739.

Thus, the first indication that the DCA thought it was empowered to require submission of all changes, and approval of substantial changes, was its letter of April 20, 1972, indicating opposition to the 1971 revisions. If there is any "long established" administrative practice here, it is that of the DCA's acquiescence in the BRA control of changes.

3. Conceivably there may be some situations in which the nature and magnitude of the revisions of a plan could fundamentally alter the essence of the project. In such an event new DCA approval might be required, an issue we need not decide here. See *Shannon* v. *United States Dept. of Housing & Urban Dev.* 305 F. Supp. 205 (E. D. Pa.), revd. on other grounds, 436 F. 2d 809 (3rd Cir.); *Margulis* v. *Lindsay,* 31 N. Y. 2d 167. In any case, the 1971 revisions do not constitute a substantial change.

Any assessment of the magnitude of the September 9, 1971, revisions must be made with reference to the plan as a whole, not simply with reference to the affected parcel. The plan has been developed as a comprehensive

---

[8] "Notwithstanding any special or general law, every department, commission, board or official vested by law with the power to make and issue rules or regulations general in scope, shall file an attested copy thereof, together with a citation of the law by authority of which the same purport to have been issued, with the state secretary, and such rules or regulations, whether or not they require the approval of the governor and council or other authority, before taking effect, shall not take effect until so filed. The foregoing provision shall not apply to . . . rules or regulations affecting solely the internal management or discipline of a department, commission, board or office, nor to orders or decrees made in specific cases within the jurisdiction of a department, commission, board or official. The state secretary shall file and index all rules and regulations filed with him hereunder, noting and keeping available such references to preceding rules and regulations as may be necessary for certification purposes."

362 Mass. 602                                            619

Commr. of the Dept. of Community Affairs *v.* Boston Redevel. Authy.

scheme for a large, integrated area; even a change which totally altered one small parcel might have only a negligible effect on the overall nature of the development. Whether the comparison should be made with the original 1957 plan, which was approved by the DCA, or with the revised 1959 plan, which was not approved by the DCA but which has served as the working plan for the last thirteen years, is not at issue since in our view the September 9, 1971, revisions do not fundamentally change either plan.

The revisions in question, as we have noted, have the effect of combining parcel 2 (previously designated "public" and intended as the site of a school) with parcels E and F (previously designated as "Multi-Family Residential") into a new parcel, 2–1E–1F, designated "multi-family residential with complementary and accessory commercial uses."

Parcel 2, an area of some 2.4 acres adjacent to parcel E, was originally designated "public" and it was proposed by CRP that a school be constructed on the site. However, in 1962, when the city decided not to construct a school on that site under the terms of the master leasehold agreement, CRP acquired first refusal rights to the parcel. CRP currently intends to use the site for 152 units of low and moderate income housing for the elderly. In the circumstances giving rise to the change, since the use currently proposed for the site is one which, at least in other contexts, we have recognized as "public" (*Opinion of the Justices*, 331 Mass. 771, 776–777; *Massachusetts Housing Fin. Agency* v. *New England Merchs. Natl. Bank*, 356 Mass. 202, 211–214), we cannot characterize this change as constituting a fundamental change in the plan.

Nor can the change in the rest of the parcel be seen as so substantial as to constitute a fundamental change. The designation "multi-family residential with complementary and accessory commercial uses" now encompasses plans for two 35–37 story apartment buildings, including two partial floors of professional office space,

an underground parking garage, a skating rink and swimming pool, retail stores, and a 10 story office building. While the construction of the office building obviously means that area F will be more commercial than under its original designation, against the background of the full sweep of the West End project, comprising upwards of fifteen major structures and related facilities spread over forty-eight acres of land, the change shrinks in significance. The residential character of the entire plan has not been altered since recent plan revisions for commercial development have not substantially curtailed the residential building originally contemplated. The number of units built and proposed is ninety-five. per cent of the number projected in the 1957 plan.[9] In short, the redesignation of one parcel of the project now allows somewhat more intensive commercial use, but without impairing the strongly residential character of the development.

We make two final observations on the DCA's allegations of "substantial change." First, it is quite clear that the revisions of September 9, 1971, do not alter the West End plan with respect to any of the six findings which the DCA, under G. L. c. 121, § 26KK, made when it originally approved the project. Thus, at least as to those matters in which the DCA had the clearest interest, the changes can hardly be seen as substantially affecting that interest. Second, it must be pointed out that although the DCA's opposition to the revisions apparently stems in part from the failure of the West End plan to provide low income housing, that is a factor quite extraneous to the approval standards specified in G. L. c. 121, § 26KK. Moreover, at no time has any such requirement been a part of the West End plan. From its inception, the West End project has been a "land assembly and redevelopment project," more recently known simply as urban renewal, involving the clearance of a substandard area and the creation by private enterprise

---

[9] The 1957 plan contemplated the construction of 2,400 units. The buildings already completed and proposed provide 2,271 units.

of a commercial-public-residential complex. Although persons displaced by the project were to be given preference as tenants in the new residential units, it was provided from the outset that rentals would be at prevailing levels. Thus, the amount of low income housing provided by the West End project is not relevant to the issue whether substantial changes have been made.

4. The defendants have argued that the doctrine of laches is applicable to this set of facts. In view of our disposition of the case we need not reach those arguments.

5. We thus conclude that the statute governing the DCA approval does not operate in the circumstances of this case to prohibit construction under plan revisions assailed by the plaintiff. The statute does not appear to have been designed to allow the DCA at the eleventh hour to block this plan, on its face subject to revision without approval, which the DCA might have tailored to its taste when it first approved it. That is the issue in this case and we so resolve it.

A final decree is to be entered in the county court declaring that no further approvals of present plans by the DCA or the Boston city council, are required in order to permit the proposed construction to be carried on to completion.

*So ordered.*