447 Mass. 333 (2006)                                    333

Central Steel Supply Co., Inc. v. Planning Board of Somerville.

CENTRAL STEEL SUPPLY CO., INC., & another[1] vs. PLANNING
BOARD OF SOMERVILLE & others.[2]

Middlesex. April 4, 2006. - July 24, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Urban Renewal. Redevelopment Authority. Redevelopment of Land.*

This court concluded that changes to an existing urban renewal plan that
removed all light industrial uses from the redevelopment area and identi-
fied the plaintiffs' property as an acquisition parcel subject to a taking by
eminent domain constituted a "major plan change," as defined by 760
Code Mass. Regs. § 12.03 (2) (1996), consistent with the underlying goals
of the original plan and therefore did not require new or renewed findings
of eligibility for urban renewal under G. L. c. 121B, § 48 [338-342];
further, this court concluded that the department of housing and com-
munity development did not overstep its statutory authority by promulgat-
ing 760 Code Mass. Regs. § 12.03 (2), which eliminated the requirement
for additional findings of eligibility under G. L. c. 121B, § 48, when an
urban renewal plan change is made [342-343], and that the application of
the regulation in the instant case was neither arbitrary or capricious
[343-344].

CIVIL ACTION commenced in the Superior Court Department on
November 20, 2002.

The case was heard by *Leila R. Kern*, J., on motions for
judgment on the pleadings.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*James D. Masterman* for the plaintiffs.

*Annapurna Balakrishna*, Assistant Attorney General, for
Department of Housing and Community Development.

*Anne M. Thomas* for Somerville Redevelopment Authority.

*David P. Shapiro*, Assistant City Solicitor, for Planning Board
of Somerville, submitted a brief.

[1] 99 Foley Street LLC. We acknowledge the amicus briefs of the Pioneer
Institute for Public Policy Research and the Institute for Justice, and the New
England Legal Foundation.

[2] Somerville Redevelopment Authority (SRA) and the Commonwealth, acting
by and through the Department of Housing and Community Development
(department).

334           447 Mass. 333 (2006)

Central Steel Supply Co., Inc. *v.* Planning Board of Somerville.

The following submitted briefs for amici curiae:

*William H. Mellor, Clark M. Neily, III, & Dana Berliner*, of the District of Columbia, *& Jorge Schmidt*, of Florida, for Institute for Justice & another.

*Michael E. Malamut & Martin J. Newhouse* for New England Legal Foundation.

IRELAND, J. This case centers on a change to an existing urban renewal plan (1980 Assembly Square Revitalization Plan, or 1980 plan), created pursuant to G. L. c. 121B, which covers the entire 130-acre district in Somerville (city) known as Assembly Square. The plaintiffs,[3] Central Steel Supply Co., Inc. (Central Steel), and 99 Foley Street LLC, own property within the Assembly Square area currently utilized for light industry. In 2002, the defendants, the planning board of Somerville (planning board), Somerville Redevelopment Authority (SRA), and the Department of Housing and Community Development (department), adopted a major plan change (2002 major plan change) to the 1980 Assembly Square Revitalization Plan that removed all light industrial uses from the redevelopment area and identified the plaintiffs' property as an acquisition parcel[4] subject to a taking by eminent domain.[5]

The applicable regulations define "major plan changes" to existing plans as "significant change[s] in any of the basic elements" of a plan. 760 Code Mass. Regs. § 12.03 (2) (1996). These regulations provide that such changes do not require new or renewed findings of eligibility for urban renewal under G. L. c. 121B, § 48. It is undisputed that the 2002 major plan change to the 1980 plan was substantial. Rather than deem the change a

---

[3]At oral argument, the defendant planning board of Somerville (planning board) waived its challenge to the plaintiffs' standing.

[4]Central Steel Supply Co., Inc. (Central Steel), the business, and its real estate ownership counterpart, 99 Foley Street LLC, are the occupant and owner of the parcel that is the subject of this dispute.

[5]On appeal, the plaintiffs do not directly challenge the planning board's only relevant decision, that the plan change adopted by the SRA and the department conforms with the general plan for the city. The plaintiffs' only mention of the general plan is in a footnote in their brief, where they cite *Benevolent & Protective Order of Elks, Lodge No. 65* v. *Planning Bd. of Lawrence*, 403 Mass. 531, 555 (1988). This citation does not support the plaintiffs' statement that "zoning codes are not comprehensive plans." Therefore, as to the planning board, we deem these arguments waived. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

new plan, which would require new or renewed findings of eligibility, the defendants concluded that the proposed change to the 1980 redevelopment plan was instead a "major plan change," consistent with the underlying goals of the 1980 plan, and therefore additional § 48 findings were not required.

The plaintiffs commenced an action in the Superior Court, claiming that the 2002 major plan change fundamentally altered the essence of the 1980 plan, thus requiring new or renewed findings of eligibility for urban renewal under G. L. c. 121B, § 48. The parties submitted a statement of the evidence and filed cross motions for judgment on the pleadings. A Superior Court judge granted the defendants' motion, and the plaintiffs appealed.

We transferred the case to this court on our own motion to determine whether the defendants' decision was arbitrary or capricious, and whether identifying the plaintiffs' property as an acquisition parcel in the major plan change was proper. Because we conclude that the changes to the 1980 plan, although significant, were a logical continuation of the 1980 plan, and thus would not require new or renewed findings of eligibility; and that identifying the plaintiffs' property as an acquisition parcel was lawful, we affirm the decision of the Superior Court judge.

1. *Facts.* a. *The 1980 plan.* In 1980, the SRA, acting as the city's urban renewal agency and redevelopment authority pursuant to G. L. c. 121B, § 9, and its board of aldermen, found that the Assembly Square area was a "substandard, decadent, or blighted open area" and qualified as an eligible project area under G. L. c. 121B, § 48. The SRA prepared and submitted to the department the 1980 plan to carry out urban renewal activities within the Assembly Square area. The department, determining that the "area [was] both substandard and decadent and . . . detrimental to the health, safety, and welfare of the community," approved the plan as being in accordance with G. L. c. 121B, § 48.

Among the major goals and objectives of the 1980 plan were to increase the real estate investment and tax base; provide additional jobs; develop and plan a new revitalized industrial-commercial area; improve accessibility to the area by providing

new streets; encourage new commercial, light industrial, hotel, and office uses; explore at a future date the possible location of a rapid transit station in the area; and investigate the feasibility of creating a combination of recreational open space and waterfront housing.

Pursuant to the 1980 plan, the character of Assembly Square was to be predominantly transformed from industrial to commercial. However, some industrial uses were allowed to remain in the urban renewal area. Specifically, the plan stated that the "[r]etention of current industrial jobs and tax base in the Northeasterly sector of the project area is an obvious objective. Well established firms such as . . . Central Steel . . . provide a large number of jobs to the City." The Central Steel property was not identified as an acquisition parcel in the 1980 plan and the plaintiffs did not challenge the plan's approval.

The 1980 plan left the fate of the remaining industrial uses in Assembly Square to "the forces of the marketplace." The plan did contemplate that these industrial parcels "may present excellent opportunities for new commercial and residential uses in the future." The plan recognized that acquiring these remaining industrial parcels in 1980 "would require public land-banking and cause unnecessary hardship on these businesses." The plan permitted the current owners to determine whether it was in their best interest to change to a compatible use or sell. The plan had a term of twenty years and was scheduled to expire in 2000.[6]

b. *The 2002 major plan change.* In 2000, the city's office of planning and community development[7] submitted a major planning study on the status of Assembly Square urban renewal area.[8] The study formed the basis for developing the 2002 major plan change. During 2001 and 2002, the city's office of housing

---

[6]This expiration date was extended several times between 2000 and 2002 by "minor plan changes" made pursuant to 760 Code Mass. Regs. § 12.03 (1) (1996), which states: "A minor plan change is a plan change that does not significantly affect any of the basic elements of a previously approved Urban Renewal Plan."

[7]This agency is now the office of housing and community development. The SRA often acts through this office.

[8]This study was referenced by the judge below and was inadvertently omitted from the record appendix on appeal. We accept the defendants' supplemental

and community development exchanged written correspondence with the department in connection with the evolution of the 2002 changes. On May 22, 2002, the SRA voted unanimously to approve a major plan change to the 1980 plan and forwarded it to the board of aldermen and the planning board. A public hearing on the plan change was held June 18, 2002. The public hearing was advertised in the local newspaper and all Assembly Square property owners, including Central Steel, were given written notice in advance of the meeting. All persons present at the hearing were provided an opportunity to comment, and written comments were accepted until June 24, 2002. At the public hearing, Central Steel made public statements in opposition to the proposed major plan change.

On June 20, 2002, by a unanimous vote, the planning board found that the major plan change was in conformity with the general plan for the community as a whole.[9] On September 26, the SRA and the board of aldermen, both by unanimous votes, approved the major plan change with a few minor revisions.[10] On October 8, the plaintiffs submitted documentation and a cover letter to the department in opposition to the 2002 major plan change. On October 9, the office of housing and community development submitted the major plan change to the department for approval. By letter dated October 28, the depart-

filing of this document and reject the plaintiffs' contention that the submission was an attempt to advance a novel argument offered at oral argument.

[9]The city does not have a formal general plan or a master plan.

[10]One such revision provided that, as to parcels designated acquisition parcels, "[a]cquisition and relocation costs for the acquisition parcels will be paid for by the redeveloper(s), and no eminent domain taking will be made until a redeveloper has first provided adequate assurances to the SRA, in the form of appropriate financial instruments, that such redeveloper will be fully responsible for all costs of acquisition and relocation, including without limitation, any additional damages awarded in a court of law pursuant to a petition brought under the Massachusetts Eminent Domain statute, G. L. c. 79, and related court costs and attorneys' fees."

Section 12.02(1)(g) of the 1980 plan was amended to require that "prior to exercising the power of eminent domain, the SRA will require reasonable evidence from the designated redeveloper that such redeveloper has used diligent efforts to obtain title to the acquisition parcels through fair and equitable private negotiations." Moreover, § 12.02(8) of the 1980 plan was amended to provide that the "relocation plan shall include time frames which are considered adequate for relocation of the businesses affected."

ment approved the 2002 major plan change. The 2002 major plan change extends the term of the 1980 plan to August 1, 2022.

There were numerous changes to the original plan. In her approval letter, the director of the department noted:

> "The original 1980 Assembly Square Urban Revitalization Plan was created to assist in the transition of the Assembly Square area from warehouse/distribution, heavy industry, and rail yards to commercial uses, including retail, office, hotel, restaurant and entertainment. The changes to the Plan . . . will support redevelopment of the Assembly Square district into a mixed use development to include: 900 residential units, including at least 125 affordable [residential units]; office and research and development space; retail, entertainment and restaurants; hotel space; institutional space; garage and on-grade parking spaces; a new Main Street and secondary roads; landscaped, public open spaces; and a new transit stop."

Indeed, the 2002 major plan change expresses a new vision for Assembly Square. The change envisions a tighter, more urban street grid than did the 1980 plan. It also places greater emphasis on residential uses, as a component of mixed use, than the 1980 plan. Although the 1980 plan retained some light industrial uses, such as Central Steel, the 2002 major plan change excludes light industrial uses. The Central Steel property is identified as an acquisition parcel along with the other designated industrial parcels in the urban renewal area. By identifying the Central Steel property as an acquisition parcel within the urban renewal area, the SRA has reserved the power to take it by eminent domain if private negotiations, a prerequisite under the plan, fail.

2. *Discussion.* a. *Fundamental change.* The plaintiffs' primary argument is that the 2002 major plan change "fundamentally alters the essence" of the 1980 original plan, and additional findings of eligibility under G. L. c. 121B, § 48, are therefore required. The plaintiffs also contend that the department overstepped its statutory authority by promulgating regulations that eliminate the requirement for additional findings of eligibility

under G. L. c. 121B, § 48, when an urban renewal plan change is made; and that the regulations, as applied, allow for little more than a "rubber-stamp inquiry" of any proposed changes to a G. L. c. 121B urban renewal plan. For the reasons discussed below, these arguments fail.

The conduct of the defendants is governed by the urban renewal program statutes, G. L. c. 121B, §§ 45-52, which "provide[] a comprehensive scheme for the approval and administration of urban renewal plans." *St. Botolph Citizens Comm., Inc.* v. *Boston Redevelopment Auth.*, 429 Mass. 1, 3 (1999). The program grants urban renewal agencies "broad powers . . . including the power of eminent domain." *Id.*

The G. L. c. 121B scheme is silent as to the procedure for amending an urban renewal plan. Cf. G. L. c. 121A, § 13. However, in 1996, pursuant to the authority granted to it by G. L. c. 121B, § 29, the department amended the regulations governing all major changes to urban renewal plans. See 760 Code Mass. Regs. § 12.01 (1996). The new regulation, 760 Code Mass. Regs. § 12.03 (2), now states:

> "A major plan change is a significant change in any of the basic elements of a previously approved Urban Renewal Plan. The request for a major plan change shall be accompanied by evidence of a public hearing, a Planning Board determination that the proposed change is in conformance with the general plan for the community as a whole, City Council or Town Selectmen approval, and evidence that all affected redevelopers have been notified of the plan change, have been given an opportunity to comment, and that any such comments have been considered. If deemed necessary for its decision, the Department may request additional local approvals or information."

From 1986 through the recent amendment, the regulation governing major plan changes provided:

> "If the plan change is determined by the Department to be a major plan change, local approvals shall be obtained and the Department shall approve the plan change as required by [G. L. c. 121B, § 48]. Local approvals include

Resolution of the Authority amending the plan; planning board determination that the proposed plan change is in conformance with the General Plan; City Council or Town Selectmen approval; and consent of affected redevelopers. . . . The application to [the department] for formal approval of the plan change shall include detailed description of the plan change and the effect of the plan changes on project activities, including a revised summary of project data, if necessary; and local approvals of the plan change."

760 Code Mass. Regs. § 15.02(f)(2)(a) (1986).[11]

The plaintiffs rely on *Commissioner of the Dep't of Community Affairs* v. *Boston Redevelopment Auth.*, 362 Mass. 602, 618 (1972) (*DCA*), for the proposition that fundamental changes to an urban renewal plan require additional G. L. c. 121B, § 48, findings. This reliance is misplaced. The *DCA* case predates the enactment of the first set of urban renewal regulations in 1978. See *id.* at 609. Prior to enactment of the 1978 regulations, there was no directive as to what approvals were required for plan changes. The issue in the *DCA* case was whether the predecessor to G. L. c. 121B required DCA approval of changes to a publicly initiated urban renewal project. Although we concluded there that the revisions were not substantial and, therefore, no review was required, we "left open the question whether [department] approval might be required in 'situations in which the nature and magnitude of the revisions of a plan could fundamentally alter the essence of the project.' " *Boston Edison Co.* v. *Boston Redevelopment Auth.*, 376 Mass. 151, 154 (1978), quoting *DCA, supra* at 618. Given that we are not here confronted with a new plan; that the regulation governing plan changes is consistent with the statute; and that all of the changes proposed in the 2002 major plan change fit squarely within those criteria contemplated by the current urban renewal regulatory scheme, we need not presently address the question left open in the *DCA* case.[12]

---

[11]The 1978 regulations governing major plan changes also required department approval "as required by Section 48 of Chapter 121B." See 760 Code Mass. Regs. § 15.02 (f) (2) (a) (1978).

[12]The judge assumed, without deciding, that a "fundamental change" to a

We begin with the substance of the 2002 major plan change. Contrary to the plaintiffs' assertions, the 2002 major plan change was not a new plan; it was a "significant change in . . . the basic elements" of the previously approved 1980 plan. 760 Code Mass. Regs. § 12.03 (2). As the record reflects, the old plan never lapsed; the changes thereto were consistent with the main objectives of the original plan, and it was not arbitrary or capricious for the department to make this determination.

The fact that the 2002 major plan change extended the life of the original plan for an additional twenty-two years does not strengthen the plaintiffs' case. As we have stated, urban renewal plans have long lives and often require modification "after their initial approval to address changes in economic realities and urban conditions." *St. Botolph Citizens Comm., Inc.* v. *Boston Redevelopment Auth.*, *supra* at 4. This was such a change. The 2002 major plan change was a logical extension of the 1980 plan; it used the primary goals of the 1980 plan to fit within a new vision of Assembly Square.

Also, as the judge noted, the shift to mixed uses was consistent with the goals outlined in the 1980 plan. Both the 1980 plan and the 2002 major plan change seek to encourage real estate investment, increase tax revenues, and create more jobs. Although the 2002 major plan change places greater emphasis on mixed uses, the shift is consistent with the regulation and the original plan.

Moreover, the identification of the plaintiffs' property as an acquisition parcel was consistent with the original development scheme and therefore did not constitute a new plan. Although identifying the plaintiffs' property as an acquisition parcel marked a significant change in the plaintiffs' status under the plan, the plaintiffs were not unaware of this possibility. See,

G. L. c. 121B urban renewal plan would require renewed findings that the site currently is a substandard, decadent, or blighted open area. She concluded, however, that the specific changes proposed by the 2002 major plan change, namely, the exclusion of light industrial uses, the naming of Central Steel as an acquisition parcel, and the proposed mixed uses, did not amount to a fundamental change. We do not reach the question whether a fundamental change to an existing G. L. c. 121B urban renewal plan triggers the need for additional findings pursuant to § 48, because we conclude that the defendants' determination that this was a major plan change was proper.

e.g., *DCA, supra* at 619 ("even a change which totally alter[s] one small parcel might have only a negligible effect on the overall nature of the development"). In the 1980 plan, the parcels designated as light industry were only spared from acquisition to retain jobs and preserve the tax base; owners were warned that these uses were inconsistent with the over-all development scheme.

Turning to the lawfulness of the applicable regulation, 760 Code Mass. Regs. § 12.03 (2), and the defendants' compliance therewith, we give substantial deference to the department, the agency charged with administration of the applicable urban renewal statute. See *Manning* v. *Boston Redevelopment Auth.*, 400 Mass. 444, 453 (1987). See also *Felix A. Marino Co.* v. *Commissioner of Labor & Indus.*, 426 Mass. 458, 460-461 (1998). Moreover, "[p]romulgated regulations have the force of law, and bind the agency." *Benevolent & Protective Order of Elks, Lodge No. 65* v. *Planning Bd. of Lawrence*, 403 Mass. 531, 550 (1988).

We reject the plaintiffs' argument that our cases and the regulatory history have treated major plan changes as if they are new plans, and therefore the department's interpretation of the new regulation, 760 Code Mass. Regs. § 12.03 (2), unlawfully avoids a more meaningful review of proposed changes to G. L. c. 121B urban renewal plans. The cases cited by the plaintiffs do not assist our review. See *Bronstein* v. *Prudential Ins. Co.*, 390 Mass. 701 (1984) (G. L. c. 121A); *Boston Edison Co.* v. *Boston Redevelopment Auth.*, 376 Mass. 151 (1978) (same); *Boston Edison Co.* v. *Boston Redevelopment Auth.*, 374 Mass. 37 (1977) (same); *DCA, supra* (G. L. c. 121B); *Boston Redevelopment Auth.* v. *Charles River Park "C" Co.*, 21 Mass. App. Ct. 777 (1986) (same). First, most of the cases were decided under G. L. c. 121A (urban redevelopment corporations), which requires additional findings on a determination that a proposed change is fundamental. Also, the G. L. c. 121B cases cited are not factually analogous. See, e.g., *Boston Redevelopment Auth.* v. *Charles River Park "C" Co., supra* at 781-782 (using definition of "fundamental change" outlined in *DCA* case to define scope of "modification" used in existing plan).

As the plaintiffs recognize, these cases also involve urban renewal under the prior regulatory scheme, which initially made no mention of agency review of plan changes, and later explicitly required review and approval of plan changes pursuant to G. L. c. 121B, § 48. The current regulation removed the requirement for additional § 48 findings, and it is this regulation on which we must rely to determine whether the agencies' actions were reasonable, and not arbitrary or capricious. See *Benevolent & Protective Order of Elks, Lodge No. 65* v. *Planning Bd. of Lawrence, supra* at 538 (judicial review in G. L. c. 121B redevelopment projects under arbitrary and capricious standard). See also *Forsyth Sch. for Dental Hygienists* v. *Board of Registration in Dentistry,* 404 Mass. 211, 218 (1989) (board's decision disturbed only if based on legally untenable ground, whimsical, unreasonable, capricious, or arbitrary).

Regarding the sufficiency of the regulation, the defendants did not, as the plaintiffs argue, abdicate their responsibility under the statutory scheme by removing G. L. c. 121B, § 48, review of major plan changes. The regulation sets forth six requirements that provide for comprehensive review of any proposed major plan change. Given that the statute, G. L. c. 121B, § 48, is silent as to the process for changing an urban renewal plan, it was reasonable for the agency to promulgate new regulations requiring this extensive review of its own actions, and to comply with the requirements therein. This action was well within the agency's statutory authority, and we do not disturb it. See *DCA, supra* at 613-614 ("That this silence in the statute was intentional is suggested by the fact that analogous statutes which provided for [departmental] approval of other plans went further and expressly required approval of 'fundamental' or 'substantial' revisions"). See also *Benevolent & Protective Order of Elks, Lodge No. 65* v. *Planning Bd. of Lawrence, supra* at 550 (once agency promulgates regulations, it must comply with them).

Based on the changes to the 1980 plan, and in the specific circumstances of this case, the plaintiffs have failed to establish that any of the defendants involved in the approval of the 2002 major plan change acted arbitrarily or capriciously in following the requirements of 760 Code Mass. Regs. § 12.03 (2). To the

contrary, in consultation with the department, the SRA looked to the regulations that govern major plan changes and followed them to the letter. Therefore, the plaintiffs' argument that additional findings were required under G. L. c. 121B, § 48, fails.[13]

b. *Taking*. The plaintiffs also argue that the judge below erred by failing to hold that a taking by eminent domain pursuant to the "unlawful" 2002 major plan change violates the public use clause of the Fifth Amendment to the United States Constitution and art. 10 of the Massachusetts Declaration of Rights. In the 2002 major plan change, the plaintiffs' property was identified as an acquisition parcel. The plan further provides that if the plaintiffs' negotiations with a private developer fail, the SRA may take the parcel by eminent domain. No actual taking has yet occurred, and we need not address the matter. All we decide today is that the 2002 major plan change was lawful.[14]

3. *Conclusion*. For the foregoing reasons, the decision of the judge affirming the approval of the 2002 major plan change and granting the defendants' motion for judgment on the pleadings is affirmed.

*So ordered.*

---

[13] We have considered, but need not discuss, the additional cases relied on by the plaintiffs. These cases involve statutory and regulatory schemes that impose different requirements and they are inapposite.

[14] For reasons acknowledged by the plaintiffs, their final argument — that a land disposition agreement (LDA) dated June, 2002, and entered between the SRA and a private developer was not properly approved by the department — lacks merit. The applicable regulation provides that:

"The Department shall approve the disposition price, the proposed purchaser or lessee (redeveloper) and a land disposition agreement (instrument describing the terms of such sale or lease). The land disposition agreement for each parcel shall insure that the redeveloper conforms to and carries out the requirements of the Urban Renewal Plan and that the interests of the project are safeguarded. The time permitted for the performance of each obligation of the redeveloper shall be specified."

760 Code Mass. Regs. § 12.05(2) (1996). The regulation does not specify a timeline for department approval. The LDA was submitted to the department and scheduled for final approval prior to closing, which is all that the regulation requires.