FRANK BRONSTEIN & others *vs.* THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA & others
(and a consolidated case[1]).

Suffolk.  October 6, 1983. — January 5, 1984.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Statute,* Construction.  *Redevelopment of Land.  Condominiums,* Urban
redevelopment project.  *Cooperative Housing.*

The provision of G. L. c. 121A, § 18D, prohibiting conversion to condo-
minium ownership of rental housing units constructed as part of an ur-
ban redevelopment project does not govern conversion of such units to
cooperative housing.  [703-708]
Conversion of rental housing units constructed as part of an urban re-
development project to condominium or cooperative ownership would
constitute a fundamental change in the project within the meaning of
St. 1960, c. 652, § 13, so as to require approval by the Boston Rede-
velopment Authority.  [709-711]
General Laws c. 121A, § 18D, governing condominium conversion in
urban redevelopment projects undertaken after 1975, would be appli-
cable to a proposal made after 1975 for the condominium conversion
of rental property in an urban redevelopment project undertaken prior
to 1975.  [711-712]
Creation of condominium units in an urban redevelopment project can be
proposed only under G. L. c. 121A, § 18D.  [712-713]

QUESTIONS OF LAW certified to the Supreme Judicial
Court by the United States District Court for the District of
Massachusetts.

*Douglas G. Moxham (Judith Gail Dein & Herbert W.
Vaughan* with him) for The Prudential Insurance Company
of America & others.

*Saul A. Schapiro* for Frank Bronstein & others.

---

[1] John Wolbarst & others *vs.* Robert Heinen & others.

NOLAN, J.  A judge of the United States District Court for the District of Massachusetts has certified two questions to this court pursuant to S.J.C. Rule 1:03, as amended, 382 Mass. 700 (1981).  These questions concern the construction of G. L. c. 121A, § 18D, inserted by St. 1975, c. 827, § 19, which regulates condominium conversion for the purpose of urban redevelopment in Massachusetts.  The two questions pose issues of first impression.  The facts which we set forth are taken from the order of certification, which also contains the questions to be answered.

The plaintiffs in the consolidated class actions are tenants who reside in three rental apartment buildings owned by The Prudential Insurance Company of America (Prudential).  These apartment buildings are located at the Prudential Center in Boston and they are called The Gloucester, The Boylston, and The Fairfield.  The tenants are attempting to prevent Prudential from pursuing its plans to convert these apartment buildings to cooperative housing.

In 1962, the Boston Redevelopment Authority (BRA) and the mayor of Boston approved Prudential's application for the construction of the Prudential Center as part of an urban redevelopment project under G. L. c. 121A.  In the proposal, Prudential reserved a future option to construct residential units within the project area.  In 1965, the mayor and the BRA approved Prudential's plans to build three residential rental apartment buildings.

On April 12, 1982, Prudential proposed the creation of three cooperative corporations to which it would convey the three residential units.  This proposal has yet to be approved by the BRA.  In spite of the lack of approval, Prudential proceeded to act in accordance with its "resident conversion program."

First, Prudential notified all tenants of its plans to convert the three residential apartment buildings to cooperative ownership.  Second, on various occasions Prudential outlined the three options available to each tenant.  These options were purchase, relocation with a relocation allowance or continued occupancy for one year with a waiver of the

relocation allowance. Finally, Prudential formally notified the tenants that their tenancies would be terminated upon the expiration of their current leases.

As a result of Prudential's actions, a class action was commenced in the Boston Housing Court seeking declaratory and injunctive relief against Prudential's proposed conversion, and against any steps, including the termination of leases, in furtherance of the Prudential proposal. The case was removed to the United States District Court for the District of Massachusetts.

Shortly after commencement of this action, Prudential notified those tenants not subject to rent control of an increase in rent. A separate action was initiated alleging that the rental increases were part of an illegal attempt to drive out the tenants in order to further Prudential's conversion plans.[2]

*Question One.* Question one asks: "Does the provision of Massachusetts General Laws Chapter 121A, Section 18D, that states, 'No units of rental housing constructed as part of an approved project under this chapter may be converted to *condominiums* pursuant to this section,' (emphasis supplied) apply as well to conversion of rental housing to *cooperatives?*" We answer this question in the negative.

The tenants argue that the statute should be read to include both condominiums and cooperatives. First, they assert that as a matter of linguistic analysis, modern condominiums and cooperatives are included within the use of the term "condominium." Through an oversimplified description of the general characteristics pertaining to each,[3] the tenants suggest that a condominium and a cooperative are the same for purposes of the statute. Alternatively, they contend that no substantive difference exists between cooperatives and condominiums for purposes of G. L. c. 121A,

---

[2] The plaintiffs in the first class action were not subject to these rental increases.

[3] The tenants suggest that both condominiums and cooperatives are interests in real estate owned by more than one person or entity which jointly exercises dominion over the property.

because, regardless of which method is chosen, the conversion must serve an identifiable public purpose. They argue that Prudential's conversion plan does not satisfy this criterion and therefore cannot be allowed.

These arguments misconstrue the basic tenets of statutory construction. The statutory language, when clear and unambiguous, must be given its ordinary meaning. *Hashimi* v. *Kalil*, 388 Mass. 607, 610 (1983). When the use of the ordinary meaning of a term yields a workable result, there is no need to resort to extrinsic aids such as legislative history. *Id.* Moreover, the statutory language is the principal source of insight into legislative purpose. *Hoffman* v. *Howmedica, Inc.*, 373 Mass. 32, 37 (1977).

A housing "cooperative" connotes a multidwelling complex in which each owner acquires an interest in the entire complex and a proprietary lease to his own apartment. Black's Law Dictionary 302 (5th ed. 1979). A "condominium," on the other hand, describes "a single real property parcel with all the unit owners having a right in common to use the common elements, with separate ownership confined to the individual units." Black's Law Dictionary 267 (5th ed. 1979). A condominium therefore is a statutory creation, G. L. c. 183A, separate and distinct from a cooperative, G. L. c. 157, § 3A. This is clear from § 18D itself which specifies that the provisions of G. L. c. 183A shall govern unless otherwise indicated. It is equally clear that G. L. c. 183A, does not govern cooperatives. The fact that each is governed by separate legislative enactments fortifies the conclusion that the word "condominium" does not include within its meaning the term "cooperative."

The tenants discuss at great length the evolution of G. L. c. 121A. As originally adopted, it was an attempt to eliminate substandard living conditions in urban areas by utilizing private capital to revitalize decaying urban areas. St. 1945, c. 654, §§ 1 and 3. Although the Legislature amended G. L. c. 121A in 1960 to include the construction of commercial, industrial, institutional, recreational or governmental buildings (St. 1960, c. 652, § 1), the fundamental underpinning of the statute remained the same, i.e., that

such projects be undertaken for a public purpose. See *Opinion of the Justices*, 341 Mass. 760, 776-777 (1960).

While we agree with the tenants' summary of the legislative history, we do not agree that we should include cooperatives within the ambit of G. L. c. 121A, § 18D, because Prudential's proposed conversion may not fulfil a public purpose. The tenants believe that the conversion cannot fulfil a public purpose because Prudential's plans arise from profit seeking motives. We conclude that the argument concerning the lack of public purpose should be directed to the BRA. The Legislature has provided specific standards by which the BRA is to determine whether a particular proposal will fulfil a public use and benefit. St. 1960, c. 652, § 13. "Our inquiry is limited to ascertaining compliance with those standards." *Boston Edison Co.* v. *Boston Redevelopment Auth.*, 374 Mass. 37, 62 (1977). Since the actual proposal is still pending before the BRA, our inquiry on this matter would be premature. The scope of judicial review of the BRA's actions includes correcting errors of law and applying the substantial evidence test to factual findings on public use and benefit, among other things. *Id.* at 46-48. See St. 1960, c. 652, § 13. However, we do not have the authority initially to determine what constitutes a public purpose. Moreover, on review, we need not be concerned with the motives of the applicants under G. L. c. 121A. The purpose of the applicants in proposing the conversion is wholly irrelevant, if a project will eliminate substandard or decadent conditions.

Secondly, we find that when the word "condominium" is given its ordinary meaning within the statute, it yields a workable result. Therefore, even assuming that the tenants' policy arguments are directed to the correct forum, we need not resort to extrinsic aids such as legislative history. *Hashimi* v. *Kalil*, 388 Mass. 607, 610 (1983). The precatory language of § 18D characterizes the creation of condominiums as an "additional means of development of property for the purposes of eliminating blighted, open, decadent or substandard conditions in certain areas." The

Legislature could not have intended the inclusion of cooperatives as an "additional means of development," because cooperative ownership has been an accepted method of development pursuant to G. L. c. 121A, § 3, since the statute's enactment in 1945.

Furthermore, the terminology[4] used in § 18D specifically relates to condominium ownership and comports with the terminology used in G. L. c. 183A, which governs condominium ownership. This terminology is not easily transferable to the separate and distinct statutory creature, the housing cooperative. G. L. c. 157, § 3A. See *Kostick* v. *Dupree*, 10 Mass. App. Ct. 929 (1980) (appropriate terminology includes "cooperative apartment" and "cooperative housing corporation"). For these reasons we decline to imply that the legislative policy requires that we include the term "cooperative" within G. L. c. 121A, § 18D. "[W]e have no right to conjecture what the Legislature would have enacted if they had foreseen the occurrence of a case like this; much less can we read into the statute a provision which the Legislature did not see fit to put there, whether the omission came from inadvertence or of set purpose." *King* v. *Viscoloid Co.*, 219 Mass. 420, 425 (1914).

In a final attempt to thwart the conversion, the tenants request that we selectively apply the legislative policy behind G. L. c. 121A, § 18D, to the present situation through common law principles. The tenants assert that the legislative inclusion of mandatory requirements for the construction of rental property as well as condominium units within § 18D implies that the legislative policy behind the enactment of § 18D was to increase the rental housing in the Commonwealth.

While we agree that the Legislature attempted to alleviate the shortage of rental housing in urban areas, we do not believe it was the sole purpose behind the enactment of G. L. c. 121A, § 18D. Another obvious purpose was to allow the construction of condominiums to eliminate blight-

---

[4] Examples of such terminology are: "units," "unit owners," "common areas and facilities," and "organization of unit owners."

ed, open, decadent, or substandard conditions. The Legislature expressly stated this in the first paragraph of the section.

The Legislature's concern with the shortage of rental units in urban areas is not completely obvious from the wording of the statute. Therefore we will investigate the legislative history of G. L. c. 121A, § 18D. As originally proposed, § 18D contained no provisions for the construction of rental housing. 1975 Sen. Doc. No. 1568. Nevertheless, the section, as ultimately approved, contained these provisions. 1975 Sen. Doc. No. 2130. See 1975 Sen. Doc. No. 2009. Section 18D provides that, for each condominium unit authorized, a corporation will be obligated to construct, manage, operate, and maintain within the project area an equal number of rental units. Twenty-five percent of the rental units must be constructed for the use of low income persons or families. The latter requirement may be waived or modified if a housing board finds that (1) the waiver or modification is reasonable in view of the regional need for low income housing and (2) that low income housing exists within the city or town in which the project is located in excess of 20% of all housing units. G. L. c. 121A, § 18D. We construe the insertion of these provisions to indicate that the Legislature attempted to alleviate the potential and existing dilemma of rental shortages and displacement which results from excess condominium development and conversion. See Conversion Condominium Development: An Issue of Tenants' Rights, 30 Clev. St. L. Rev. 99, 100-101 (1981). In accordance with this assumption, we conclude that the prohibition against conversion of redevelopment projects approved under G. L. c. 121A was an attempt to maintain the status quo in urban communities with respect to rental property.

The tenants suggest that we incorporate this legislative policy into the common law and thereby apply the prohibitions of § 18D to the proposed cooperative conversion as a common law principle. This we decline to do.

"This basic common law approach, applied to statutory statements of policy, permits a selective application of those principles expressed in a statute that reasonably should govern situations to which the statute does not apply explicitly." *Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 291 (1980). In *Zapatha, supra,* the court applied the policies of good faith and unconscionability as found in the sales provisions of the Uniform Commercial Code to a franchise agreement, without subjecting the entire agreement to the sales provisions. *Id.*

*Zapatha, supra,* can be distinguished from the present situation. There the court applied statutory policy to common law contract issues, which, for centuries have been within the province of this court. *Id.* In contrast, condominium ownership, G. L. c. 183A, cooperative ownership, G. L. c. 157, § 3A, and urban redevelopment, G. L. c. 121A and G. L. c. 121B, are purely statutory creations which the Legislature has always governed. If the tenants' position were followed, we would in effect be inserting the word "cooperative" within § 18D, because there exists no common law regarding cooperatives upon which to apply the legislative policy. Our actions would amount to judicial legislation. This exceeds our authority. See *Harry Alan Gregg, Jr. Family Found., Inc. v. Commissioner of Corps. & Taxation*, 330 Mass. 538, 544 (1953).

We are aware of the potential hardship and displacement that occurs in a cooperative or condominium conversion and the resulting decrease of available rental housing in urban areas. Comment, The Regulation of Rental Apartment Conversions, 8 Fordham Urb.L.J. 507, 512-517 (1980). However, even if an injustice or hardship were to result, this court cannot insert words into a statute, where, as here, the language of the statute, taken as a whole, is clear and unambiguous. "To stretch the meaning of a statute so as to adjust an alleged injustice, inequity or hardship could cause a multiplicity of interpretations as each alleged injustice, inequity or hardship arose." *Milton v. Metropolitan Dist. Comm'n*, 342 Mass. 222, 227 (1961). For these reasons we answer question one in the negative.

*Question Two.* Question two asks: "Assuming question one is answered in the affirmative, is Section 18D, which does not apply to 'projects undertaken' prior to 1975, applicable to a proposed conversion of Prudential apartments to cooperatives, where the Prudential apartments were built prior to 1975, but the application for their conversion to cooperatives was filed after 1975?"

Although our answer to question one is in the negative, at Prudential's request we address the issue whether § 18D will be applied to a condominium conversion. We believe that an answer to the question at this time will avoid future litigation, because Prudential indicates that it presently contemplates converting to condominiums instead of cooperatives. However, we also believe that portions of our decision relate as well to cooperative conversion. For these reasons, we consider it useful to answer question two. *Hein-Werner Corp.* v. *Jackson Indus., Inc.*, 364 Mass. 523, 524 (1974).

Statute 1975, c. 827, § 21, provides in part: "The provisions of this act shall not be applicable to projects undertaken or for which applications pursuant to the provisions of [G. L. c. 121A] or [St. 1960, c. 652] . . . have been filed prior to the effective date of this act . . . ." On the basis of this language, Prudential argues that the prohibition against condominium conversion of rental property approved under G. L. c. 121A, § 18D, does not apply retroactively to the Prudential Center apartments, a project undertaken in 1965, prior to the effective date of the amendments. We disagree.

We concur with the tenants' assertion that Prudential's potential application for a condominium-cooperative conversion would amount to a fundamental change in the project and thereby would subject Prudential to the 1975 amendments. Statute 1960, c. 652, § 13, which applies to projects within Boston, provides: "After the approval of a project . . . the . . . insurance company . . . may apply to the authority for leave to change the type and character of the buildings on such project; and the authority may grant

such application unless in its opinion the proposed change is a fundamental one, in which case the authority shall proceed as if such application to change were an application for the original approval of the project."

Prudential first argues that a conversion to condominiums or cooperatives does not result in a change of the project, because each type of conversion is merely a sale of the project which should be governed by G. L. c. 121A, § 18B, made applicable to projects within Boston by St. 1960, c. 652, § 12. The language of § 18B concerns the procedure relating to acquisition of existing projects by associations formed for that purpose. This language and the language of St. 1960, c. 652, § 13, concerning changes in existing projects are not mutually exclusive. Although either conversion will ultimately lead to the sale of the project, it will also change the nature of the project from that of rental property to property owned by the tenants and others. Therefore, in the case of a condominium, each unit purchaser or in the case of a cooperative, the corporation, must receive approval from the BRA under § 18B when purchasing an interest. Moreover, Prudential must receive approval from the BRA under St. 1960, c. 652, § 13, for any proposed conversion, which would change the existing project.

We must now address the issue of whether the "change" amounts to a "fundamental change" within the meaning of St. 1960, c. 652, § 13. A "fundamental change" has been defined as one in which the "nature and magnitude of the revisions of a plan could fundamentally alter the essence of the project." *Boston Edison Co.* v. *Boston Redevelopment Auth.*, 376 Mass. 151, 154 (1978), quoting *Commissioner of the Dep't of Community Affairs* v. *Boston Redevelopment Auth.*, 362 Mass. 602, 618 (1972).

In *Boston Edison, supra,* the court upheld a BRA determination that an increase in the height of an approved project would not fundamentally change the "essence" of the project. The proposed increase did not substantially change the use of the project because the project would still serve the same demands for electricity from the same users. *Id.* at 152.

The present situation can be distinguished from *Boston Edison, supra.* Although rental property and condominium or cooperative ownership will result in residential use, they will not serve the same demands from the same tenants. We may assume that the conversion will force some tenants to move or to purchase the units for fear of encountering a similar occurrence at another apartment. Conversion Condominium Development: An Issue of Tenants' Rights, 30 Clev. St. L. Rev. 99, 103-106 (1981). Moreover, each form of residential use demands different obligations from the occupants. We note that tenants in a residential apartment building are required to pay rent. In contrast, the condominium owner acquires title to his unit and thereby assumes those duties required by ownership. A cooperative owner acquires a property interest in the entire structure and an "owners" lease in his apartment. Although we have determined in question one that the prohibition against conversion of rental housing projects to condominiums contained in § 18D does not apply to cooperatives, we conclude that a conversion to cooperatives would amount to a fundamental change in the project. Similarly, we find that condominium conversion would constitute a fundamental change in the project.

Prudential, in the alternative, argues that even assuming that a potential conversion would amount to a fundamental change, the prohibitory language of § 18D does not apply. It contends that the language of St. 1960, c. 652, § 13, merely requires the BRA to treat a fundamental change as if it were an application for a new project. Only the approval process would be the same because a fundamental change such as a condominium conversion would not involve construction. Construction, Prudential argues, is a necessary portion of the definition of the term "project" found in G. L. c. 121A, § 1.[5]

---

[5] General Laws c. 121A, § 1, as amended through St. 1968, c. 761, § 10, defines "project" as: "any undertaking consisting of the construction . . . and the operation and maintenance of such buildings and facilities after construction."

We accept Prudential's interpretation of the definition of "project" because we must give "and," a conjunctive meaning. See *Eastern Mass. St. Ry.* v. *Massachusetts Bay Transp. Auth.*, 350 Mass. 340, 343 (1966). However, the language of St. 1960, c. 652, § 13, requires that the BRA consider an application for a fundamental change as if it "were an application for the original approval of the project." Therefore the entire original project as conceived will be reviewed in connection with the proposed changes. As such, the construction required for the former plans would satisfy the criteria in the definition of "project." G. L. c. 121A, § 1. The new project, *i.e.*, the former plans plus the proposed fundamental change, would be subject to the 1975 amendments because the approval will occur after the effective date of the statute.

Finally, Prudential argues that § 18D may not be the only section which authorizes condominium development. On the basis of this assertion Prudential contends that the prohibition against condominium conversion contained in § 18D would not be applicable. Prudential relies on language in the ninth[6] and eleventh[7] paragraphs of § 18D to support its position. However, Prudential neglects to point to a section other than § 18D which allows condominium development.

The precatory language of § 18D declares that it is a "public policy of the Commonwealth to permit the creation of condominiums within project areas by corporations authorized to undertake projects under this chapter as an *additional* means of development of property" (emphasis sup-

---

[6] The pertinent language in the ninth paragraph reads as follows: "If the proposed condominium is a project or a portion of a project for which initial approval and authority is sought pursuant to other sections of this chapter . . . the information to be furnished . . . shall be contained in the application required pursuant to section five . . . ."

[7] The pertinent language in the eleventh paragraph reads as follows: "[O]r if the proposed condominium is a project or a portion of a project for which initial approval is sought pursuant to other sections . . . the application shall be transmitted to the appropriate officials of the city or town in which the project is located."

plied). The use of the word "additional" indicates that the Legislature intended that § 18D operate as the sole means by which the creation of condominiums may be proposed. The absence of the term "condominium" throughout the remaining sections of c. 121A further enforces this conclusion.

Moreover, even if we were to accept Prudential's argument that St. 1975, c. 827, § 21, precludes the application of G. L. c. 121A, § 18D, to its potential proposal for condominium conversion, the result would be the same. If, in fact, § 18D does not apply to Prudential, our conclusion that § 18D operates as the sole grant of authority to propose the creation of condominiums leaves Prudential without a means by which it can submit such a proposal to the BRA.

We realize that this interpretation places Prudential in a "catch 22" dilemma as to condominiums because, regardless of the application of § 18D, Prudential may not submit to the BRA a proposal to convert to condominiums. However, we believe that this result is not unjust, especially in light of the Legislature's concern with the shortage of rental housing in urban areas. Therefore, we see no merit in Prudential's claims.