BOSTON REDEVELOPMENT AUTHORITY vs. CHARLES RIVER
PARK "C" COMPANY & others.[1]

Suffolk.    February 7, 1986. — April 2, 1986.

Present: GREANEY, C.J., WARNER, & FINE, JJ.

*Condominiums,* Urban redevelopment project. *Redevelopment of Land.*
*Words,* "Multi-family residential use."

The conversion of residential buildings located in the West End urban
   redevelopment area of Boston from rental units to condominium units
   is a change from "multi-family residential use," as that phrase is used
   in the West End Redevelopment Plan, and, consequently, requires prior
   approval for the conversion by the Boston Redevelopment Authority.
   [779-784]
Discussion of G. L. c. 121A and G. L. c. 121B with respect to urban renewal
   projects. [782-784]
Holding that prior approval of the Boston Redevelopment Authority is
   required for the conversion of residential buildings located in the West
   End redevelopment area of Boston from rental units to condominium
   units, this court declined, in the circumstances, to order rescission of
   any real estate transactions with respect to the units which had already
   been sold as condominiums. [784]

CIVIL ACTION commenced in the Superior Court Department
on March 19, 1984.

Motions for summary judgment were heard by *John J. Irwin,*
*Jr.,* J.

*Saul A. Schapiro* for the plaintiff.
*Marcus E. Cohn* for Prynne Realty Trust.
*Stephen S. Young (Miriam R. Goldstein* with him) for Haw-
thorne Residents Association, intervener.
*Robert J. Muldoon, Jr.,* for Charles River Park "C" Com-
pany.

---

[1] Prynne Realty Trust, an entity which purchased the property and agreed
to convert the building to condominiums and sell the units, and, as an
intervener, Hawthorne Residents Association.

FINE, J. Is the conversion of residential buildings, located in the West End urban redevelopment area of Boston, from rentals to condominiums a change from "multi-family residential use," as that phrase is used in the West End Redevelopment Plan (the plan), such as to require prior approval for the conversion by the Boston Redevelopment Authority (BRA)? A Superior Court judge hearing the controversy on cross motions for summary judgment determined that the change was not one requiring BRA approval. Relying on *Bronstein* v. *Prudential Ins. Co. of America,* 390 Mass. 701 (1984), we reverse.

The BRA, an "urban renewal agency" as defined in G. L. c. 121B, § 9, inserted by St. 1969, c. 751, § 1, and successor to the Boston Housing Authority, filed its complaint for declaratory and injunctive relief on March 19, 1984, to prevent the conversion to condominiums of two buildings known as Two and Nine Hawthorne Place unless the BRA gives its approval for such conversion.[2] The defendant Charles River Park "C" Company (CRP), a limited partnership organized in Massachusetts, is a successor in interest to Charles River Park, Inc., the original developer of the West End redevelopment project. The history of the project through 1972 is outlined in *Commissioner of Dept. of Community Affairs* v. *Boston Redevelopment Authy.,* 362 Mass. 602, 604-609 (1972). The two apartment buildings at Hawthorne Place were constructed by CRP and, commencing no later than 1966, the 480 apartment units in the buildings were rented to tenants. Beginning in 1982, CRP began planning to convert the rental units to condominiums, and that plan has since been in the process of implementation. By mid-March of 1984, 162 tenants had signed purchase and sale agreements for their units. Shortly thereafter, a master deed to Hawthorne Place was recorded.

The West End plan requires that the Hawthorne Place buildings be devoted to "multi-family residential use." No one disputes that, for a period of fifty years from the adoption of the plan in 1957, the use restriction is binding upon the developers

---

[2] On March 22, 1984, another Superior Court judge denied the plaintiff's motion for a preliminary injunction.

and their successsors pursuant to the provisions of various leases and covenants in deeds, as well as G. L. c. 121B, § 49.[3] The Supreme Judicial Court decided the *Bronstein* case on January 5, 1984. On March 1, 1984, the BRA, in reliance on *Bronstein,* voted to require its prior approval for conversion of any dwelling units from rentals to condominiums or cooperatives in any urban renewal project in the city. Before the date of that vote, conversions of similar properties in urban renewal areas of the city had been accomplished without the BRA's having asserted any right of prior approval.

With respect to changes or modifications of the plan after the lease or sale of the land, the plan provides that it "may be modified . . . provided that such modifications are consented to by the lessee or purchaser of the property affected by the proposed modifications and by the [BRA]." The BRA "has been granted the basic responsibility for the proper execution of the plan." *Commissioner of the Dept. of Community Affairs* v. *Boston Redevelopment Authy.,* 362 Mass. at 615. If proposed revisions of a plan are of such "nature and magnitude" that they "could fundamentally alter the essence of the project," approval of the Department of Community Affairs (DCA) (and the mayor and the city council) might also be required. *Id.* at 618. No party in this case takes the position that the conversion to condominium use is a change of such magnitude that approval is also required from DCA (or the mayor and the city council).

The defendants' position is that the operative language in the plan, "multi-family residential use," is unambiguous. It relates, they say, to the purpose for which the property is actually used by the occupants and not to the form of ownership. That proposition is not without support in logic and judicial

---

[3] The same obligation existed under G. L. c. 121, § 26LL, the statute governing urban renewal projects that was in effect in 1966 when the land was conveyed to the developer. General Laws, c. 121, §§ 23-26MMM, were repealed by St. 1969, c. 751, § 2. Section 1 of that statute replaced G. L. c. 121 with a new chapter, 121B. Hereinafter we will refer to the appropriate section in G. L. c. 121B rather than the statute in effect when the project was approved, G. L. c. 121. In no respect applicable to this case is there a material difference between the two statutes.

precedent. See *CHR Gen., Inc.* v. *Newton,* 387 Mass. 351 (1982), where, for zoning purposes, the court said, at 356-357, the city had to concede that "a building composed [of] condominium units does not 'use' the land it sits upon any differently than an identical building containing rental units." See also *Park West Village Associates* v. *Abrams,* 65 N.Y. 2d 716 (1985). But compare *Boston Five Cents Sav. Bank* v. *Department of Housing & Urban Development,* 768 F.2d 5 (1st Cir. 1985). Condominium ownership of dwelling units in large structures in Boston in 1957, when the plan was adopted, however, was certainly not common,[4] and undoubtedly it was assumed by the drafters of the plan that the apartments would be occupied by renters. See *Commissioner of Dept. of Community Affairs* v. *Boston Redevel. Authy.,* 362 Mass. at 620-621. There is some indication in the plan itself that rentals were contemplated inasmuch as it refers to the statutory requirements that purchasers or lessees "give preference in the selection of tenants for dwelling units built in the project area to families displaced [by the project]. . . ." G. L. c. 121B, § 49, inserted by St. 1969, c. 751, § 1.

We come now to the effect of the *Bronstein* case on the present controversy. In *Bronstein,* the issue, in relevant part, was whether the conversion to condominium or cooperative ownership of rental housing units constructed as part of an urban redevelopment project approved under G. L. c. 121A would constitute a "fundamental change" in the project. The property involved, the apartment buildings at the Prudential Center in Boston, was required to be devoted to "residential use." If conversion to condominiums or cooperatives was a "fundamental change," the BRA would have been required to "proceed as if such application to change were an application for the original approval of the project." St. 1960, c. 652, § 13. If, on the other hand, the proposed change was not "fundamental" but was a change only of "the type and character of the buildings on the project," the change would not have required such

---

[4] The statute, G. L. c. 183A, which authorized condominium ownership in Massachusetts was first inserted in 1963. See St. 1963, c. 493, § 1.

elaborate proceedings. However, it would still have required the BRA's approval. *Ibid.* In determining whether the change was a fundamental one, the court adopted the definition of "fundamental change" set forth in *Commissioner of Dept. of Community Affairs* v. *Boston Redevelopment Authy.,* 362 Mass. at 618. That definition was the one to be used in determining when a change in a project under G. L. c. 121B was so substantial as to require approval by the DCA (and also the mayor and the city council). To be a "fundamental change," such a change would have to "alter the essence of the project." *Id.,* quoted in *Bronstein, supra,* at 710.

The court in *Bronstein* determined that conversion of rental property to either cooperatives or condominiums would constitute a "fundamental change" in the project. The court reasoned: "Although rental property and condominium or cooperative ownership will result in residential use, they will not serve the same demands from the same tenants. We may assume that the conversion will force some tenants to move or to purchase the units for fear of encountering a similar occurrence at another apartment. Conversion Condominium Development: An Issue of Tenants' Rights, 30 Clev. St. L. Rev. 99, 103-106 (1981). Moreover, each form of residential use demands different obligations from the occupants. We note that tenants in a residential apartment building are required to pay rent. In contrast, the condominium owner acquires title to his unit and thereby assumes those duties required by ownership. A cooperative owner acquires a property interest in the entire structure and an 'owners' lease in his apartment." *Bronstein, supra* at 711.

As we note above, the only issue raised in the present case is whether the BRA may insist upon a right of prior approval of a conversion of rental units to condominiums. That issue turns on whether the conversion is a "modification" of the plan. A "modification" is of a lesser order than a "fundamental change." Thus, in order for us to rule in this case that BRA approval is required for the conversion of the rental units to condominiums, we need not go so far as to determine that the change is a fundamental one as defined in *Bronstein.* Fundamental changes of 121B projects, as we have said, require

more than BRA approval. Of course, realistically, not every change in a 121B project would be a "modification" requiring submission to the BRA. For BRA approval to be required, a change must be more than de minimis; it must be of some significance. But it does not have to be "fundamental." We do not have to define precisely how significant a proposed change in a 121B project must be to trigger the requirement of BRA approval because we view the reasoning of the court in the *Bronstein* case, supporting its conclusion that the proposed change in that case was a fundamental one, to be applicable, a fortiori, to the present case.

The only notable distinction between the facts of the two cases is that in the *Bronstein* case the project was approved under G. L. c. 121A and the West End project was approved under G. L. c. 121B. The difference between c. 121A projects and c. 121B projects are discussed in *Boston Edison Co.* v. *Boston Redevelopment Authy.,* 374 Mass. 37, 52-53 (1977). See also Weinstein, Urban Renewal in Massachusetts, 47 Mass. L. Q. 5, 6-13 (1962). For purposes of the issue before us, we view the differences between the two statutory schemes as less meaningful than the similarities.

The differences are the following. Chapter 121A projects are privately initiated and privately owned throughout their existence, whereas c. 121B projects are publicly initiated and planned; developers of c. 121A projects receive tax concessions, whereas developers of c. 121B projects receive substantial benefits but not in the form of tax concessions; the procedures for the public approval of c. 121A projects in Boston are less stringent than are those for c. 121B projects.[5] And finally, c. 121A was amended by St. 1975, c. 827, adding, in part, a new section (18D) containing the provision that "[n]o units of rental housing constructed as part of an approved project under this chapter may be converted to condominiums pursuant to this section." (The remainder of § 18D authorized the creation

---

[5] Based upon these differences, the court ruled in the *Boston Edison Co.* case that in reviewing c. 121A projects it would apply a substantial evidence test, whereas in reviewing a c. 121B project, it would be governed by the arbitrary and capricious standard.

of condominiums in project areas after the date of enactment under certain specified conditions.) No similar provision governing condominium conversions was added to c. 121B.

On the other hand, the same legislative purpose underlies both c. 121A and c. 121B: to provide public assistance for the elimination of substandard, decadent, or blighted open areas in urban settings, and to promote sound community growth. G. L. c. 121A, § 2. G. L. c. 121B, § 45. Under both statutory schemes, the developer's agreement to undertake a project, according to a plan approved by numerous public agencies and officials, is the basis for the award to the developer of significant public benefits. As to both types of projects the use limitations in the plan are expressions of public policy designed to further the legislative goals. And, as to both types of projects, the BRA has the "primary responsibility for representing the public interest in the project and for supervising the execution of the plan." *Commissioner of Dept. of Community Affairs* v. *Boston Redevelopment Authy.*, 362 Mass. at 613.

The differences between the two statutory schemes in relation to the type of public assistance (compare G. L. c. 121A, §§ 10 and 15, with G. L. c. 121B, § 46) and the approval process for a project (compare St. 1960, c. 652, § 12, with G. L. c. 121B, §§ 46-48), in our view, do not bear on the issue of the type of change in the execution of the project which is serious enough to trigger the requirement of BRA approval. Nor do we think the fact that c. 121A was amended to include § 18D, and c. 121B was not amended to include a similar provision, requires a different result. This is because the existence of § 18D does not enter into the *Bronstein* court's stated reasoning on whether a change from rental to condominium or cooperative use is fundamental. Moreover, the BRA is only seeking approval power; it is not seeking to have all condominium conversions in urban renewal projects barred. And, finally, the *Bronstein* court ruled that conversion of the units from rentals to cooperatives would constitute a fundamental change even though § 18D was applicable only to condominiums.

Thus, if conversion of the Prudential buildings from rentals to condominiums was a "fundamental change" from "residen-

tial use," it follows that a conversion from rentals to condominiums at Hawthorne Place is at least a significant change or "modification" of a plan the terms of which limit the property to "multi-family residential use" and, as such, BRA approval is required as a condition for such conversion.

It remains for us to determine the appropriate relief. The BRA did not bring suit against the individual condominium purchasers. We see nothing in the prayers for relief requesting that any real estate transactions with respect to the units at Hawthorne Place which have been completed to date be rescinded. Nor, in fairness under all the circumstances, do we consider such action appropriate. The practice of the BRA before March of 1984 was not to assert any right to be consulted prior to condominium conversions of apartment buildings in urban renewal areas. There is no language in the applicable statutes, contracts, or other documents expressly providing for the right which we determine the BRA has, and there has been no prior judicial decision granting the BRA that right. The BRA is entitled, however, to: (1) a declaration, limited to the West End plan, that any of the dwelling units not already sold as condominiums which must, according to the plan, be used for multi-family residential purposes may not in the future be sold as condominiums without the prior approval of the BRA; and (2) an order enjoining the defendants, Charles River Park "C" Company and Prynne Realty Trust, from selling in the future any rental unit in the project used for residential purposes without such approval.[6]

*So ordered.*

---

[6] We decline to rule on the validity of the BRA vote of March 1, 1984, which would affect properties in other urban renewal areas of the city which are subject to plans which are not before us. The issue of the validity of the vote has not been fully argued, and it is not necessary that we reach that issue to resolve the rights of the parties in this case.