In re BACK BAY RESTORATIONS, INC., Debtor.

BACK BAY RESTORATIONS COMPANY (A Limited Partnership), Plaintiff,

v.

The CITY OF BOSTON, et al., Defendants.

Bankruptcy No. 90–11664–HAL. Adv. No. 90–1217.

United States Bankruptcy Court, D. Massachusetts.

Aug. 23, 1990.

Leonard M. Salter, Wasserman & Salter, Boston, Mass., for debtor.

Edward F. Kelly, Saul A. Schapiro, Schapiro, Hays & Kelly, P.C., Boston, Mass., for defendants/City of Boston, Boston Redevelopment Authority.

RULINGS ON BOSTON REDEVELOPMENT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT

HAROLD LAVIEN, Bankruptcy Judge.

Essentially, Back Bay Restorations Company ("BBRC") is seeking, through this action, to have this Court reopen the issues previously decided by the Massachusetts Land Court, of whether BBRC should remain subject to M.G.L. c. 121A and St. 1960, c. 652 (collectively, "c. 121A"), a Massachusetts urban redevelopment statute.

While the debtor characterizes its complaint as one which seeks a reduction in "taxes" due, in fact, the case is an attempt by the debtor to have this Court remove it from the provisions of c. 121A or to second guess the 14 years of the Boston Redevelopment Authority's ("BRA") administration of the debtor's performance. The debtor hopes by this device to only pay ordinary real estate taxes rather those in-lieu-of-tax payments required by c. 121A. BBRC seeks this relief despite the fact that it voluntarily submitted itself to the provisions of c. 121A, and has also agreed as part of a court settlement in prior litigation to, once again, comply with all the requirements of c. 121A including the payment of in-lieu-of-tax payments which it now, 14 years later, seeks to challenge in this case.

In 1976, BBRC applied to operate under c. 121A in order to acquire and renovate apartment buildings in Boston. In 1986, after BBRC converted many of the apartments to condominiums, allegedly in viola-

tion of the provisions and requirements of c. 121A, the BRA, pursuant to its statutory oversight responsibilities, brought an enforcement action in the Massachusetts Land Court to rescind the sale of these units.

An agreement was reached between the parties, which was incorporated in a judgment of the Land Court in 1986. This agreement provided for BBRC to comply with the provisions of c. 121A, including another so-called 6A agreement providing for the in lieu of tax provisions, but released the converted units from c. 121A status so as not to harm innocent purchasers and mortgagees.

In the instant suit, BBRC, once again, seeks to avoid its contractual and statutory obligations for the in-lieu-of-tax payments and asks this Court, in practical terms, to reopen the Land Court judgment and relitigate those issues. Since "Proposition 2½" in 1981 substantially reduced Boston real estate taxes and the real estate down turn, the in-lieu-of-tax payments required under c. 121A became an ever increasing burden.

Chapter 121A is one of the principal Massachusetts urban redevelopment statutes. It has been used extensively in Boston since the 1960's when the Prudential Center was built as a c. 121A project. Under c. 121A, private developers apply to the Boston Redevelopment Authority for permission to undertake a project. The BRA examines and investigates the application and holds a public hearing to determine if the proposed project meets the requirements of c. 121A. If the BRA so finds, it issues a Report and Decision approving the project and authorizing the proposed redeveloper to operate under c. 121A for a term of years, formerly 40 years, now, at least, 15.

A c. 121A project is a partnership between the public sector and the private sector designed to accomplish a public purpose—the elimination of urban blight and underdevelopment. *See, Boston Edison Co. v. Boston Redevelopment Authority,* 374 Mass. 37, 371 N.E.2d 728 (1977); *see also,* c. 121A, § 2.

Under c. 121A, a redeveloper can obtain the benefits of eminent domain, when ap-

propriate, and receives relief from the requirement to pay property taxes on the project. In return, the redeveloper agrees to operate the project as initially approved in the BRA's Report and Decision. The redeveloper also agrees to operate in accordance with c. 121A and executes a Regulatory Agreement with the BRA to that effect. *See* c. 121A, § 18C. Further, the redeveloper agrees to a limitation on net income on a project for the term of its c. 121A status. *See* c. 121A, § 18C.

Pursuant to c. 121A, § 10, a redeveloper is required to pay an excise to the state amounting to five (5%) percent of a project's gross income and one (1%) percent of its fair cash value. The state returns this amount to the City of Boston. In addition, the redeveloper is required to execute a contract with the City, known as a 6A Contract, pursuant to which the redeveloper agrees to make payments in-lieu-of-taxes to the City. The amount paid to the state is credited against the amount owed to the City under the 6A Contract.

Chapter 121A contains a variety of other requirements and provisions including a prohibition against converting residential apartments to condominiums. *See,* c. 121A, § 18D. In this case, the debtor claims a waiver of this provision should apply to it. All of these provisions are part of a package to which a redeveloper voluntarily submits in order to obtain the benefits of c. 121A which include, besides the benefits mentioned previously, the stability and foreseeability of payments in lieu of property taxes which, in many cases, made financing of a project possible.

The Massachusetts legislature has chosen to place the responsibility for enforcing the terms of c. 121A's public-private partnership in Boston with the BRA, which is Boston's urban renewal agency. *See,* St. 1960, c. 652, as amended; *see also, Commissioner, Dept of Com. Aff. v. Boston Redevelopment Authority,* 362 Mass. 602, 289 N.E.2d 867, 876 (1972) (in regard to an analogous urban renewal statute, M.G.L. c. 121B, "as a matter of legislative judgment, the local agency, in this instance the BRA rather than the state agency has been

granted the basic responsibility for the proper execution of the plan.").

Under both chapters 121A and 121B, the BRA is vested with the responsibility of evaluating proposals for urban redevelopment, monitoring their implementation, deciding when to allow modifications, and enforcing compliance with the requirements of the statutes and the contractual obligations undertaken pursuant to them. *See, Bronstein v. Prudential Ins. Co.,* 390 Mass. 701, 459 N.E.2d 772 (1984); *Boston Redevelopment Authority v. Charles River Park C Company,* 21 Mass.App. 777, 490 N.E.2d 810 (1986); *Charles River Park, Inc. v. Boston Redevelopment Authority,* 28 Mass.App.Ct. 795, 557 N.E.2d 20 (1990).

In 1976, the BRA approved an application, pursuant to M.G.L. c. 121A and St. 1960, c. 652 (collectively, "c. 121A"), for the formation of a redeveloper, BBRC, to undertake a c. 121A urban redevelopment project in the Back Bay section of Boston. The project consisted of the renovation and operation for 40 years of 86 rental apartments located in nine buildings, most of which were formerly owned by Chamberlayne Junior College.

Conversion of residential apartments in a c. 121A project to condominiums is prohibited by c. 121A, § 18D. In 1984, the Massachusetts Supreme Judicial Court ruled that a conversion from rental units to condominiums would be a fundamental change in a c. 121A project which required, at the minimum, a hearing and approval by the BRA. *See also, Bronstein v. Prudential Ins. Co.,* 390 Mass. 701, 459 N.E.2d 772 (1984).

In 1983, BBRC, without seeking approval from or notifying the BRA, filed a master condominium deed in order to sell the rental units as condominiums. BBRC had accepted the benefits of c. 121A since 1976. In fact, BBRC admits in its Verified Complaint at page 4, par. 1, that renovations it undertook would not have been possible without c. 121A since "financing was available *only* with an in-lieu-of-tax agreement under M.G.L. c. 121A." By its actions, the BBRC was attempting to get out of its package of statutory and contractual responsibilities once the BBRC unilaterally decided that market and tax law changes made it more advantageous to shed its c. 121A obligations. The BRA, in order to enforce the requirements of c. 121A, filed suit in the Massachusetts Land Court, *Boston Redevelopment Authority v. Back Bay Restorations Company et. al.,* C.A. No. 116134, against BBRC, the purchasers and their mortgagees; the BRA sought declaratory and injunctive relief including rescission as well as an order enjoining condominium conversions. Negotiations ensued and the suit was resolved pursuant to a motion to enter judgment filed jointly by the BRA and the defendants. The Court issued an Order for Judgment, which provided that the units already sold as condominiums could be kept by their buyers. The Order for Judgment reduced the c. 121A term of the project from 40 to 15 years and provided that the remaining rental units be kept under c. 121A, pursuant to an amended report and decision, a regulatory agreement and a 6A Contract, and provided that taxes due be paid and two secured notes be issued to the BRA in order to give back illegally acquired profits. The BRA has designated the funds from these notes to affordable housing. This Second Amendment was approved, the required agreements were entered into, and the notes were issued. As a result, the Land Court issued a Judgment.

The new 6A Contract, which was entered pursuant to the Order for Judgment, set forth the amounts that the BBRC is to pay to the City: for 1986, 1987, 1988—23% of the gross residential income from the project properties; and, for 1990 and 1991 until May 27, 1991—25% of the gross residential income from the project properties.

Furthermore, the 6A Contract provides that:

> The parties acknowledge that as long as this Contract is in effect the Assessing Department of the City shall determine in its sole discretion the fair cash value of the Project Properties for each calendar year or any portion thereof pursuant to Section 10 of Chapter 121A.

The new Regulatory Agreement at paragraph 7 provided:

In consideration of the exemption of the Partnership and its real and personal property which constitute the Project Properties, referred to above in paragraph 2 and described in Exhibit A attached hereto, from taxation and betterments and special assessments and from the payments of any tax, excise or assessment to or for the Project as amended, it shall pay the excises with respect to the Project as amended which a Chapter 121A entity would be bound to pay under the formulas and provisions set forth in Section 10 of Chapter 121A, and the sums as agreed upon between the Partnership and the City of Boston in accordance with the provisions of the 6A Contract.

Thus, the Land Court decision, *Boston Redevelopment Authority v. Back Bay Restorations Company, et al.,* Land Court, C.A. No. 116134 (1986), prevented BBRC from avoiding the requirements of c. 121A and provided for the payment of the excise and the payments under the 6A Contract.

This decision, entered into by all the parties, made it clear that BBRC had no right to withdraw from c. 121A, as it had sought to do so. The claim by BBRC that the judgment was reached under duress is only true in the sense that any wrongdoer, when called to task, does not voluntarily accept being subject to lawful remedies. In a sense, BBRC entered into a plea bargain before the Land Court, and now is unhappy about it. That does not constitute an adequate reason why this Court should now reopen the process rather than give full faith and credit to the state court whose decision was entered by agreement and should, therefore, be given preclusive effect.

In the instant case, BBRC seeks, under the guise of a tax abatement claim, to have the very same subject matter of the Land Court decision decided again. As discussed previously, all the statutory and contractual provisions of c. 121A are part of a total public-private partnership package. The Land Court heard a specific challenge to the prohibition on condominium conversion contained in c. 121A, § 18D. The instant case also challenges the provisions of c. 121A, § 10 and 6A and the contractual obligations flowing from them which were also established pursuant to the Land Court judgment.

The debtor cites cases in which the Bankruptcy Court hears matters despite state court default judgments in dischargeability proceedings. Those cases are readily distinguishable. Defaults indicate an ignoring or lack of concern; on the other hand, a strenuously negotiated settlement indicates a vital interest and concern. The settlement, in this case, was not a one-sided capitulation. The condominium sales were not undone, the term of the agreement was reduced from 40 to 15 years and new percentages for the in-lieu-of-tax payments were negotiated. Further, the dischargeability cases deal with a unique responsibility of a bankruptcy court to give primary consideration to a debtor's fresh start and to strictly construe denial of discharge provisions, all of which require an affirmative proof of intent. Even in that type of case, once the bankruptcy court independently determines that the debt is not dischargeable, the default judgment is not challenged but given full faith and credit as to its amount. *See, In re Comer,* 723 F.2d 737 (9th Cir.1984) where the bankruptcy court found that it was barred by the doctrine of claim preclusion from looking behind the state court default judgment for unpaid alimony and child support in determining the actual amount of the obligation. *See, also, In re 24 Hour Towing, Inc.,* 33 B.R. 281 (Bkrtcy.D.Nev.1983), holding that the bankruptcy court could not exercise its equitable power to look behind a judgment and ascertain the amount of damages, where debtor did not allege that the judgment was the result of fraud, that the prior court lacked subject matter or personal jurisdiction. The New York court, while refusing to be bound by state court judgments in dischargeability cases, found that it was bound by the determinations of state courts as to findings of liability damages and interest charges. *In re Lucas,* 21 B.R.

794 (Bkrtcy.W.D.Mich.1982), and *In re Pitts,* 31 B.R. 90 (Bkrtcy.N.D.Ga.1983); c.f. *In re Comstock Financial Services,* 111 B.R. 849 (Bkrtcy.C.D.Cal.1990) finding that a bankruptcy court or district court resolving disputes over the allowance, disallowance or subordination of claims can never be bound by prior judgment of another court except to the extent it is an initial determination of the nature of the claim and the amount of the resulting damages under non-bankruptcy law.

The debtor agrees that under 11 U.S.C. § 505, the Court has jurisdiction to determine the appropriate tax. The short answer is that this is not a matter of taxes, but a payment in-lieu-of-taxes as part of a contractual relationship which involves a bundle of rights and duties. Further, § 505(a)(2)(A) expressly excludes a matter which was contested before and adjudicated by a federal tribunal before commencement of the case, and that was clearly done in this matter. The arms length settlement agreement meets the requirements of being contested and adjudicated. This settlement took place four years before the filing at a time when the debtor was vigorously protecting its interest.

The debtor also looks to 11 U.S.C. § 105 and the Court's general equity power. The parameters of § 105 are yet to be clearly defined, but it clearly does not give the Court the right to disregard the Code and create new substantive right; rather, this section is intended to be in aid of the Court carrying out its Congressionally mandated duties. *In re Morristown and Erie R.R. Co.,* 885 F.2d 98 (3rd Cir.1989).

Under the undisputed facts in this case, the debtor who now alleges an egregious application by the BRA in setting the in lieu of tax percentage payments entered into an agreement with the BRA for a bundle of mutual benefits and obligations, including those percentages. That 6A Agreement was executed in 1976. The debtor operated under that arrangement until 1986 when a new 6A Agreement was entered into as part of a state court settlement. An action brought by the BRA for enforcement of what it claimed was a viola-

tion of its agreements by the debtor in creating and selling condominiums. At no time, over the 14 years of its operations under c. 121A, did the debtor initiate any judicial action alleging any impropriety of either the first or the second 6A Agreement. In fact, it entered in the over-all settlement. After 14 years, the equities do not call for this Court to second guess the BRA or the Land Court, both of whom have a greater specialized experience in administering the state's urban renewal program. To the extent that this Court has any discretion in the determination to consider the matter, it declines to do so. Under Massachusetts law, a valid Land Court decision may not be attached collaterally. *See, Bell v. Eames,* 310 Mass. 642, 39 N.E.2d 582 (1942). A decision of the Land Court may be appealed to the Massachusetts Appeals Court and the Massachusetts Supreme Judicial Court. The BBRC chose to take no such available action.

The Boston Redevelopment Authority's Motion for Summary Judgment is allowed. There are no material disputed facts and, as a matter of law, the Land Court's judgment and the agreements of the parties are not open for review by this Court under the doctrines of full faith and credit, res judicata, and issue preclusion. To the extent that the Court has any discretion, the equities do not call for its execution.